Bates BLOCK et al., Plaintiffs,

v.

COMPAGNIE NATIONALE AIR
FRANCE, Defendant.

Civ. A. Nos. 8286 et al.

United States District Court
N. D. Georgia,
Atlanta Division.

May 6, 1964.

William H. Schroder (Troutman,
Sams, Schroder & Lockerman), Hugh
M. Dorsey, Jr. (Hansell, Post, Brandon
& Dorsey), Herbert A. Ringel (Smith,
Field, Ringel, Martin & Carr), Atlanta,
Ga., Lee S. Kreindler, Milton G. Sincoff,
Jack L. Kroner, Stanley J. Levy, Gerald

A. Robbie, Timothy J. Healey (Kreindler & Kreindler) and Speiser, Shumate, Geoghan & Law, New York City, for plaintiffs.

E. Smythe Gambrell, Charles A. Moye, Jr., Harold N. Hill, Jr., Floyd E. Siefferman, Jr., Cicero Garner, Jr. (Gambrell, Harlan, Russell, Moye & Richardson), Atlanta, Ga., for defendant.

MORGAN, District Judge.

Plaintiff Bates Block, as Executor of the Estate of Charles Baxter Jones, Jr., and the Trust Company of Georgia, as Executor of the Estate of Julia Lowry Block Jones, and Bates Block, as Guardian and Next Friend of three minor children of the deceased Charles Baxter Jones, Jr., and Julia Lowry Block Jones, have brought suit against Compagnie Nationale Air France (hereinafter referred to as Air France) for the negligent deaths of Charles Baxter Jones, Jr., and Julia Lowry Block Jones. The action for both Mr. and Mrs. Jones each alleges two separate claims. The first claim for each of the deceased alleges that death was caused by the "act, fault, imprudence or negligence of the defendant". The second claim for each of the deceased alleges that the deaths were caused by "wilful misconduct".

Thirty-one (31) other actions growing out of the same air crash have been filed in this Court, and the complaints, together with the defensive pleadings, are substantially the same. On October 15, 1963, all of these actions were consolidated pursuant to Rule 42(a), Federal Rules of Civil Procedure, as to a determination of liability of the defendant, with a separate trial as to damages for each claim should the issue of liability be determined in favor of the plaintiffs.

These actions arise out of an air crash of an Air France 707 jet near Orly Field, Paris, France, on June 3, 1962. The de-

cedents were all members of the Atlanta Art Association, and on February 2, 1962, the Atlanta Art Association had entered into an International Charter Flight Agreement with Air France for Air France to furnish the jet liner for flight from Atlanta to Paris on May 9, 1962, with return from Paris to Atlanta on June 3, 1962. The charter charges were $36,000.00. Under the terms of the Charter Flight Agreement Air France furnished all the crews, fuel, etc.; and no passenger was to be carried unless such passenger had been issued a ticket by Air France. The International Charter Agreement was made subject to the approval of the Civil Aeronautics Board (hereinafter referred to as CAB) and, thereafter, approval for this off-route charter was granted by the CAB. The Air France plane was beginning the return flight to Atlanta according to the International Charter Agreement when the crash occurred, resulting in death to all of the passengers on board.

Plaintiffs instituted these actions in this Court by the filing of complaints, and in one claim of each complaint alleged that the plaintiffs decedents died as a result of the defendant's negligence, and that, based on the applicable law, a cause of action for recovery of damages sustained by each of the plaintiffs exists in an unlimited amount. In its answer to each of the complaints, the defendant alleged that the applicable law is the Warsaw Convention [1] (Convention for the Unification of Certain Rules Relating to International Transportation by Air), and that the plaintiffs' claims for unlimited compensatory damages are contrary to the Warsaw Convention, the laws of France, and the contract of carriage.

Plaintiffs, thereafter, filed a motion to strike (Rule 12(f), F.R.C.P.) those parts of the defendant's second defense which

[1]. The Warsaw Convention was a Convention for the Unification of Certain Rules Relating to International Transportation by Air, signed by the representatives of 23 countries at Warsaw, Poland, on October 12, 1929. Adherence to the Convention was advised by the U. S. Senate June 15, 1934, and proclaimed by the President of the United States October 29, 1934. See 49 U.S.Stat. at L. p. 3000 et seq. The Republic of France was one of the original signatory powers.

rely on the Warsaw Convention or any limitation of liability for damages, whether contained in the said Warsaw Convention, the French Statutory law, the Charter Agreement, or on the ticket.

By order dated January 29, 1964, this Court denied plaintiffs' motion to strike for the reason that the applicability of the Warsaw Convention could not be determined without reference to the facts as to the type of charter arrangement involved in this particular flight, and that, as these facts were not evident from the pleadings, the proper method to proceed would be a motion with supporting affidavits filed pursuant to Rule 56, F.R.C.P. See Augustus v. Board of Public Instruction of Escambia County, Florida, 5 Cir., 306 F.2d 862.

Plaintiffs, on March 9, 1964, filed a motion for partial summary judgment (Rule 56, F.R.C.P.) seeking the granting of a partial summary judgment dismissing and striking each and every part of the second defense to each complaint which asserts that the Warsaw Convention is applicable to this matter, and that the plaintiffs' claims for damages as set forth in their petition are contrary to, in conflict with, or limited by the Warsaw Convention, the laws of France, or any contract of carriage.

Affidavits and briefs having been filed by all parties in compliance with Local Rule 8, the matter is now before this Court for consideration. The Court also considers the briefs, memoranda, and documents heretofore filed by all the parties on the plaintiffs' motion to strike under Rule 12(f) as part of this motion.

From the evidence now presented, it appears that there are no substantial differences as to the facts surrounding the arrangements of the "Jet Trip to the Louvre".

It appears that around November, 1961, a committee of the Atlanta Art Association began working with the American Express Company to obtain a tour for the Atlanta Art Association. Sometime prior to February 2, 1962 (the date of the execution of the International Charter Flight Agreement) more than 100 members of the Association had made plans to make the trip.

The International Charter Flight Agreement provided that the carriage was subject to the rules as established by the Warsaw Convention. This agreement further provided that the Association acted as agent for its members and that a ticket was to be issued to each passenger.

The following provisions from said International Charter Flight Agreement are particularly pertinent:

"*Article 4.* OPERATIONS, INTERRUPTION OR CANCELLATION OF FLIGHTS

"(a) AIR FRANCE shall have exclusive control over the aircraft chartered hereunder and reserves the rights, in its sole discretion, to determine the route to be flown and airports to be used. * * *

*    *    *    *    *    *

"(d) The operating personnel are the servants or agents of AIR FRANCE and shall remain at all times under the exclusive control of AIR FRANCE.

*    *    *    *    *    *

"*Article 6.* CARRIAGE OF PASSENGERS, BAGGAGE AND CARGO

"Charterer shall not permit any passenger to be carried unless such passenger has been issued a ticket by AIR FRANCE, nor permit any baggage to be carried unless AIR FRANCE has issued a baggage check therefor.

*    *    *    *    *    *

"AIR FRANCE, Charterer, and all passengers and/or shippers will be bound by the terms and conditions of said AIR FRANCE tickets, baggage checks and air waybills. Any action taken by Charterer with respect to said tickets, baggage checks and air waybills shall be deemed to be taken as agent for the passenger or shipper.

"AIR FRANCE shall have such, and only such, liability to passengers or shippers with respect to the charter flight as exists under the tickets, baggage checks and air waybills so issued by AIR FRANCE.  *  *  *

*  *  *  *  *  *

"*Article 8*.  LIABILITY

"(a) Carriage furnished herein is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, Poland, October 12, 1929 (hereinafter called 'Warsaw Convention'), unless such carriage is not 'International Carriage' as defined by said Warsaw Convention.

"(b) To the extent not inconsistent with the provisions of this Agreement, the carriage of passengers, baggage and goods herein is subject to the tariffs, conditions of carriage and rules and regulations of AIR FRANCE which are made a part hereof.  *  *  *  Charterer declares that he has taken note of the provisions of said tariffs, conditions of carriage and rules and regulations, and undertakes to bring these to the notice of passengers and shippers, participating in the charter flight under this Agreement.

*  *  *  *  *  *

"(f) This Agreement is entered into by Charterer both on his own behalf and as duly authorized agent of all passengers, and shippers and consignees and other persons having any interest in the baggage and cargo carried pursuant to this Agreement.

"(g) Charterer undertakes to provide all information necessary for the completing of the traffic documents for all passengers, baggage and goods to be carried.  AIR FRANCE will supply and complete the said traffic documents.  Charterer will accept delivery of the said traffic documents on behalf of the passengers and/or shippers, and undertakes to convey to each passenger his passenger ticket and baggage check and to each shipper his appropriate air waybill.

*  *  *  *  *  *

"(j) Charterer shall obey and observe all directions and instructions given to it by the Carrier relating to the charter transportation herein specified and Charterer agrees to indemnify and hold harmless AIR FRANCE, its officers, agents, employees and servants, from all responsibility and liability for any injury, damage, expense or loss to any person or property caused by or arising out of any violation of this Agreement or any negligent act, omission, wrongful misconduct or misrepresentation of Charterer, its officers, agents, employees and servants."

NOTE: Schedule A attached to the International Charter Flight Agreement states that the Charterer is an organization "whose principal aims, purposes and objectives are other than travel".

The tickets provided for by the International Charter Flight Agreement were delivered to the passengers three weeks prior to the May 9 Atlanta departure of the aircraft.

As in every case, the question must relate to the pertinent facts, and in these suits, the question is "Does the Warsaw Convention apply to the particular flight here under consideration?"

This Court heretofore, in various hearings, has noted that there are various possible arrangements by which a charter flight might be made and the question therefore is not "Does the Warsaw Convention apply generally to charter flights", but the question is "Does the Warsaw Convention apply to this particular charter flight?"

The Warsaw Convention was signed by the President of the United States on October 29, 1934 (49 U.S.Stat. at L. p. 3000, at p. 3013) by and with the advice and consent of the Senate (49 U.S.Stat.

at L. p. 3000) as provided by the Constitution (Article II, Sec. 2, cl. 2).

[redacted] It is a valid and existing Treaty, Garcia v. Pan American Airways, Inc., 269 App.Div. 287, 55 N.Y.S.2d 317 (1945), aff'd. 295 N.Y. 852, 67 N.E.2d 257, cert. den. 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 640, and "constitutes part of the law of this land, over-riding state law and policies (U. S. Constitution, Article VI; Wyman v. Pan American Airways, 181 Misc. 963, 43 N.Y.S.2d 420, aff'd. 267 App.Div. 947, 48 N.Y.S.2d 459; 293 N.Y. 878, 59 N.E.2d 785, cert. den. 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432)."

The Convention first provides when it shall apply. It specifies three exceptions to its applicability (Articles 2 and 34) but does not except charter flights. It provides a presumption of liability in favor of the passengers and against the carrier (Articles 17 and 20) and a limitation of that liability (Article 22) with an exception to the limitation in the event of "wilful misconduct" (Article 25). It provides that if the carrier fails to deliver a ticket notifying the passenger of the applicability of the Convention, the Convention shall still apply, but the limitation of liability shall not apply (Article 3).

Like any other treaty or statute, if the facts come within its general provisions, and not with an exception, then the Treaty applies.

Article 1 of the Treaty provides that:

> "This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise."

[redacted] From the pleadings, it is undisputed that the passengers were being transported as passengers for hire by the aircraft. The Convention applies to "all international transportation of persons * * * by aircraft for hire". Thus, the Warsaw Convention applies if this was "international transportation" within the meaning of the Convention. The Convention leaves no doubt as to what is meant by "international transportation". Article 1(2) defines it as follows:

> "For the purposes of this convention the expression 'international transportation' shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention."

That Article provides that any transportation—scheduled or non-scheduled, common or private carriage, charter or otherwise—is "international" within the meaning of the Convention if the agreed-to transportation (1) is between two nations which are parties to the Convention, or (2) is "round-trip", leaving from and returning to a nation which is a party to the Convention, with an "agreed stopping place" outside that nation (whether or not the nation where the stop is made is a party to the Convention). France, the "agreed stopping place" on the subject flight, is a party to the Warsaw Convention, but the Convention would apply even if France were not a party, because the place of departure (Atlanta) and the place of termination (Atlanta) are both in the United States, which has adopted the Convention. "Round-trip" flights departing from and returning to the United States are subject to the Convention. Ross v. Pan American Airways, Inc., 299 N.Y. 88, 85 N.E.2d 880 (1949).

Thus, reading Article 1, it is clear that the "transportation" which is the subject of these actions was "international"

within the meaning of the Convention, and the Convention applies to "any" and "all" such international transportation by air.

The plaintiffs in the pending suits have contended that the Warsaw Convention does not apply to charter flights. While it is true that this question has never been the principal issue in any of the decisions decided by the Courts in this country which this Court has been able to read, and the question seems to be novel, other courts, where the issue could have been presented, have indicated that, in a similar factual situation, Warsaw would apply.

In Flying Tiger Line, Inc. v. United States, 170 F.Supp. 422, 145 Ct.Cl. 1 (1959), the plaintiff, Flying Tiger, had entered into a "Charter Agreement" with the United States to carry cargo. One of its planes, carrying $67,159.91 in goods, was lost. The question was whether the Warsaw Convention and its two-year limitation period applied. The Court said, at page 423 of 170 F.Supp.:

> "There is no serious question as to the applicability, in general, of the Warsaw Convention to the transportation involved in this case."

The transportation there involved was "chartered", yet the Court recognized that the Warsaw Convention was applicable "to the transportation involved" —charter transportation.

In the recent case of Mertens v. Flying Tiger Line, Inc., 35 F.R.D. 196, which was a case from the U. S. District Court for the Southern District of New York, the plaintiffs sued for the death of a passenger en route from California to Tokyo aboard a chartered aircraft. The United States Government had chartered the plane from the carrier, Flying Tiger,

to transport military personnel. The plaintiffs sued to recover for the wrongful death of their son, Lieutenant Frederic Thorn Mertens, a passenger on a plane operated by the defendant airline under charter to the United States Government. The plane was on a trip from California to Japan, by way of Honolulu and Wake Island. On September 9, 1958, as it was nearing its destination near Tokyo, it crashed into a mountain, resulting in the destruction of the plane and the death of all those aboard, including Lieutenant Mertens.

\* \* \* \*

> "The fatal flight which was the subject of this litigation was an international flight pursuant to the terms of the Warsaw Convention. The uncontroverted facts, the allegations of the complaint, the pre-trial order, and the prior agreement of the parties [2] made this a basic element of the case."

Plaintiffs argue that the Flight Agreement provision that the charterer was the agent of the passengers was an attempt to create a direct contractual relationship between carrier and passenger which they have contended must exist in order for the Convention to be applicable. No such direct contractual relationship is required by the Convention,[3] and in any event the direct contractual relationship existed here.

The provision of the International Charter Flight Agreement that the charterer acted as agent for the passengers was required by the CAB pursuant to statute. The CAB regulates air carriers and, through them, regulates travel agents handling air transportation. The CAB has promulgated rules and regulations governing charter flights. Those rules and regulations are contained in

---

2. "In an opinion filed on June 3, 1963, dealing with a jurisdictional motion, Judge Wyatt of this Court said: 'The parties are in agreement that the Warsaw Convention is here applicable'."

3. See Ross v. Pan American Airways, Inc., 299 N.Y. 88, 85 N.E.2d 880, 885, where the Court said: "Furthermore, while

the Convention speaks of transportation under a 'contract' and requires delivery of a ticket warning of the limitations, it is plain that the limitation is one created by the Convention itself, and is not the product of consensual arrangements between the parties".

Parts 295 (26 Federal Register 3628) and 212 (23 Federal Register 7062) of the Board's Economic Regulations (14 CFR), both of which are applicable to the flight here under consideration. The United States Government prohibits travel agents and others from chartering an aircraft at a charter rate and then selling tickets to the traveling public [CAB Economic Regulations, 14 CFR, §§ 295.20 [4] and 212.1(b)]. Travel agents are permitted (as agents of the carrier) to sell airline tickets but only on scheduled trips at the regular fare established for common carriage transportation available to all members of the public. [Sec. 403(b) of the Federal Aviation Act, 49 U.S.C. § 1373(b)]. On the other hand, the CAB allows individuals and pre-existing groups and associations, not formed merely for the purpose of chartering an airplane, to make trans-atlantic charter trips at group fares. (CAB Economic Regulations, 14 CFR, Secs. 295.2 and 212.1). 14 CFR, Sec. 212.1, provides that for passengers a charter agreement may be made:

(1) By a person for his own use;

(2) By a person (no part of whose business is the formation of groups for transportation or solicitation or sale of transportation services) for the transportation of a group of persons as agent or representative of such group;

(3) By two or more persons acting jointly for the transportation of such group of persons, or their property.

"Person" is defined so as to include "association" or "corporation" [49 U.S.C. § 1301(27)]. Thus, the Atlanta Art Association, an association not engaged in transportation directly or indirectly, could obtain group rate transportation for its members, if the charter is made by the Association as an agent or representative of such group. The CAB required that such a charterer act as agent for the passengers, and the Flight Agreement in this case was made in compliance with that rule of the CAB. Without such an arrangement, under its rules, the CAB would have disapproved the Charter Flight Agreement here involved.

From the evidence, it is clear that the CAB prescribed the form of and expressly approved the charter agreement here used, and this charter agreement included a provision clearly declaring that the Warsaw Convention applied. When the Atlanta Art Association, through its president, executed the International Charter Flight Agreement as agent for the passengers, a direct relationship arose between Air France and each passenger. The contract called upon Air France to furnish "air transportation"; thus, it was a transportation contract, a "contract of carriage".

Also, the International Charter Flight Agreement provided for the issuance of a ticket to each passenger, which would bind Air France and the passengers in a two-party agreement. These tickets were issued and delivered to the passengers approximately three weeks before the flight was initiated and, under the Flight Agreement, the passengers obligated themselves to be bound by the tickets. When the tickets were issued and delivered, as they were in this case, the requirement of the Flight Agreement insofar as tickets were concerned was fulfilled. Each ticket issued pursuant to the International Charter Flight Agreement was a "contract of carriage" between the holder and Air France.

The Warsaw Convention itself says it shall apply to "any" (Article 1, Paragraph (2) and "all" (Article 1, Paragraph (1) air transportation for hire between France and the United States. The plaintiffs contend that the Convention does not include charter flights. However, unless there is a clear excep-

4. CAB Economic Regulation, 14 CFR, § 295.20, provides: "A travel agent may not assist in the organization or assembly of a charter group, handle the sale of the air transportation to any individual members of a group, or otherwise engage in the administration of the charter flight. * * *"

tion in the Convention removing charter flights from its operations, Warsaw would apply.

Article 3 of the Warsaw Convention provides as follows:

"(1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:

"(a) The place and date of issue;

"(b) The place of departure and of destination;

"(c) The agreed stopping places * * *;

"(d) The name and address of the carrier or carriers;

"(e) A statement that the transportation is subject to the rules relating to liability established by this convention.

"(2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability."

The undisputed evidence establishes that the requirement of ticket delivery was met in the instant cases. The examination of the tickets themselves shows that they contained all the necessary particulars specified in Article 3 of the Convention.

Even the absence of tickets would not render Warsaw inapplicable. Warsaw applies to "any" and "all" transportation by aircraft for hire between the High Contracting Parties. If a ticket had not been delivered, or if it had omitted a required provision, Warsaw would still apply, but the limitation of liability would not. (Article 3, Paragraph (2). The facts show that the proper tickets were delivered; thus, a contract of direct carriage arose between Air France and the various plaintiffs. See Ross v. Pan American Airways, Inc., supra.

In the Ross case, Mrs. Ross was injured in an air accident while traveling during World War II as an entertainer for the U.S.O. The evidence in that case showed that one Abraham, an employee of the U.S.O., made the arrangements for the transportation of all the group of U.S.O. entertainers, and the United States Army paid for the tickets. Mrs. Ross never personally received her ticket but it was placed in front of her by Abraham at the airport ticket counter along with her passport. The tickets were returned to Abraham and the entertainers were given a "slip of paper" (but not the "ticket itself") admitting them to the airplane. The Court overruled Mrs. Ross' argument that she authorized no one to either accept delivery of a ticket for her or to bind her to any limitation of the carrier's liability, holding that, at 85 N.E.2d 884, 885:

"Whether or not all this added up, as a matter of law, to a sufficient showing of authority in Abraham, it can hardly be disputed that, when a ticket bearing appellant's name and all particulars as to the intended route as well as a reference to the Warsaw Convention limitation, was laid in front of appellant on the table in the airport, she, by thereafter boarding the plane as a traveler on that ticket, impliedly, if not expressly, ratified and adopted what had been done by the Army, and later by Abraham, in taking out that ticket in her name.

\* \* \* \* \* \*

"Since the Convention itself, as a statute, grants and mandates the limitation unless 'the carrier accepts a passenger without a passenger ticket having been delivered,' there is no need for a carrier who claims the limitation to show more than the delivery of an appropriate ticket, and travel of the passenger thereunder."

When the carrier shows the delivery of the appropriate ticket and the travel of the passengers thereunder, the Warsaw Convention applies. No direct contract between the parties is required. No overt consent to be bound, other than travel on the ticket, is required. The presence of third parties, such as Atlanta Art Association, is immaterial. The Warsaw Convention applies.

The Warsaw Convention contains only three exclusions. The Treaty does not apply to claims for loss of mail (Article 2), and it does not apply to transportation performed by the United States (49 U.S.Stat. at L. p. 3013). Clearly, neither of these exceptions is applicable here.

The third exclusion is found in Article 34, which provides that:

"This convention shall not apply to international transportation by air performed by way of experimental trial by air navigation enterprises with the view to the establishment of regular lines of air navigation, nor shall it apply to transportation performed in extraordinary circumstances outside the normal scope of an air carrier's business."

Thus, Article 34 applies in only two instances: (1) to "transportation by air performed by way of experimental trial by air navigation enterprises with the view to the establishment of regular lines of air navigation"; and (2) to "transportation performed in extraordinary circumstances outside the normal scope of an air carrier's business".

Clearly, the first exception is not applicable here.

The second exception provided by Article 34 itself contains two essential qualifications: (a) "extraordinary circumstances", and (b) "outside the normal scope of an air carrier's business". As shown by plaintiffs' own allegations, neither essential existed here. There was nothing "extraordinary" about this flight, and it was in the normal scope of Air France's business.

Thus, it can be seen that Warsaw applies to "any" and "all" transportation by aircraft for hire between France and the United States, excepting only those three matters expressly excluded: (1) Damage to mail; (2) Transportation performed by the United States Government; and (3) Those situations specifically mentioned in Article 34. None of these exceptions is applicable here.

This Court holds that, under the factual situation in the cases at hand, where the Atlanta Art Association chartered an aircraft from Air France for the carriage of passengers on a specific flight from the United States, a High Contracting Party to the Warsaw Convention, to France, another High Contracting Party to the Warsaw Convention, with return to the United States; where Air France, the air carrier, owns, operates, and controls the aircraft and, prior to departure, delivers proper tickets to the passengers for their passage, the Warsaw Convention would be applicable, and the passenger or passengers would be entitled to the presumption of liability contained in the Warsaw Convention as against Air France, and Air France, the air carrier, would be entitled to the limitation of liability also contained in the Convention as against the passengers.

As set out in the opinion above, the clear applicability of the Warsaw Convention to the facts of the instant suits has been demonstrated by reference to the provisions of the Convention itself and the court decisions delaying with Warsaw. This Court concludes that the language contained in the Warsaw Convention is not ambiguous, and deems it unnecessary to resort to a discussion of the legislative history of the Treaty. See United States v. Shreveport Grain & Elevator Company, 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; Hidalgo County Water Control and Improvement District v. Hedrick, 226 F.2d 1(10), (C.A.5, 1955).

Neither does the plaintiffs' contention that the Warsaw Convention is contrary to the state public policy of Georgia have merit. In the Indemnity In-

surance Company of North America v. Pan American Airways, Inc., 58 F.Supp. 338 (S.D.N.Y.1944), the plaintiff argued that the Warsaw Convention did not apply as a treaty and also argued (as the plaintiffs have done in the instant suits) that the Convention did not apply by agreement, as part of the contract of carriage.

■ After finding the Convention itself to be applicable, the Court went on to hold the defense based on the contract limitations to be valid. Regarding the plaintiff's contention in that case that the contractual limitation of liability was ineffective, the Court held, at Page 340:

"The ineffectiveness of the contract of transportation to limit defendant's liability is predicated upon the invalidity or inoperativeness of the treaty. Since the premise fails the argument must fall. The public policy against contractual limitation of liability by common carriers * * * must bow to the overriding policy of the treaty. United States v. Pink, 1942, 315 U.S. 203, 231, 62 S.Ct. 552, 86 L.Ed. 796; United States v. Belmont, 1937, 301 U.S. 324, 327, 57 S.Ct. 758, 81 L.Ed. 1134."

State public policy must bow to the overriding policy of the Treaty.

In Garcia v. Pan American Airways, Inc., 269 App.Div. 287, 55 N.Y.S.2d 317 (1945), aff'd. 295 N.Y. 852, 67 N.E.2d 257, cert. den. 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 640, supra, the Court stated (55 N.Y.S.2d at page 321):

"Inasmuch as the Convention, as a treaty, constitutes part of the law of this land, overriding state law and policies (U.S.Const. art. VI, clause 2; Wyman v. Pan American Airways, 181 Misc. 963, 43 N.Y.S. 2d 420, affirmed 267 App.Div. 947, 48 N.Y.S.2d 459, 293 N.Y. 878, 59 N.E.2d 785, certiorari denied [April 23, 1945, 324 U.S. 882], 65 S.Ct. 1029 [89 L.Ed. 1432]; United States v. Pink, 315 U.S. 203, 230, 231, 62 S.Ct. 552, 86 L.Ed. 796), its

provisions supersede the usual doctrine that the right and measure of recovery are governed by the *lex loci* and not by the *lex fori*. It comes to this: One is not bound to seek redress in the courts of this country. He may submit to the jurisdiction of the foreign state and, presumably, have his rights determined in accordance with the law of that place. That is not our concern. But if he institutes action here, the law which we will apply is that set forth by the terms of the Convention, even though it be inconsistent with the law of the place. Comity is abridged to that extent. The Titanic, 233 U.S. 718, 34 S.Ct. 754, 58 L.Ed. 1171; Royal Mail Steam Packet Co. v. Companhia de Navegaco Lloyd Brasileiro, D.C., 31 F.2d 757; The Mandu, 2 Cir., 102 F.2d 459."

In Amaya v. Stanolind Oil & Gas Company, 158 F.2d 554 (C.A.5, 1946), cert. den. 331 U.S. 808, 67 S.Ct. 1191, 91 L.Ed. 1828, the Court of Appeals for the Fifth Circuit stated at Page 556 of 158 F.2d:

"A treaty lawfully entered into stands on the same footing of supremacy as does the Constitution and Laws of the United States. * * * A treaty must be regarded as a part of the law of the state as much as are the state's own statutes and it may override the power of the state even in respect of the great body of private relations which usually fall within the control of the state."

■ Georgia public policy does not control these actions. Federal public policy controls, and Federal public policy authorizes limitations of liability in international transportation by aircraft as shown by the United States' adherence to the Warsaw Convention. See J. B. Effenson Company v. Three Bays Corporation, 238 F.2d 611 (C.A.5, 1956). The decision of the Fifth Circuit Court of Appeals in J. B. Effenson Company v.

Three Bays Corporation, supra, is in point on the matter now being considered. Federal public policy governs the contracts in these suits (the International Charter Flight Agreement and the tickets). Federal public policy authorizes limitations of liability in international air transportation by aircraft, in the amount of $8300.00 (49 U.S.Stat. at L. p. 3019; Warsaw Convention, Article 22). Regardless of the consequences, this Court is bound by the Treaty, the decisions, and the public policy established by the Treaty.

Reasoning similar to that used by this Court of Appeals in Effenson v. Three Bays, supra, has been applied in a Warsaw-contract case. In DaCosta v. Caribbean International Airways, Limited, 4 CCH Avi. Cases, 17,792 (S.D.Fla., 1955), the United States District Court for the Southern District of Florida had before it a case in which a decedent had been traveling between two points in the British West Indies. Although the transportation was not "international" within the meaning of the Warsaw Convention, the ticket used by the defendant air carrier contained a limitation of liability, "the same as that contained in the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Commonly called the Warsaw Convention Treaty, 49 Stat. 3000". The carrier relied not on the Convention itself, but upon the limitation of liability provision in the ticket. There, as here, the plaintiffs had attacked the contract defense, arguing that state public policy would not permit the enforcement of such a contractual limitation. The defendant contended that the terms of the contract were the same as provided by the Warsaw Convention, which the United States had adopted, and that state public policy could not overrule a contract provision which was the same as that provided for by the Treaty. In its decision, the Court stated, at Page 17,794:

"It cannot be said that a separate covenant in a contract, which corresponds with the amount established in a treaty, is unreasonable as to amount, or that the theory of limitation of liability is against the public policy of a state when, by treaty, the theory of limitation of liability is a part of the law of the state under circumstances where the treaty is applicable. This is not meant to intimate that the treaty is applicable to this case; it is not. But, as to carriage foreign in nature, and not domestic, the law of Florida recognizes the existence of a theory of limited liability and the reasonableness of the amount stated in the defendant's second defense."

The Court went on to say that "the public policy of Florida is determined by the law of Florida and the Constitution, treaties, and laws of the United States". Recognizing that the mere existence of the Warsaw Convention overruled traditional state public policy and created a public policy which allows, as to foreign air carriage, a limitation of liability in the amount of the Warsaw Convention, the Court held the contractual defense to be valid.

■■ Even when Warsaw is not applicable directly, it establishes a Federal public policy which affects state public policy. It is not against U. S. public policy for parties to agree between themselves to be governed by the same terms as are provided for in U. S. law by the Warsaw Convention. The law of the United States (the Convention) permits air carriers engaged in international transportation to contract for limited liability. What the Treaty allows, state public policy cannot disallow. By the same token, it is not against U. S. public policy for France (the place of the accident) to have, and for this Court to give effect to, an applicable law (Law No. 57–259 of March 2, 1957) which provides the same limitation of liability as the Warsaw Convention. The law of France provides that the rules of the Warsaw Convention apply to all aviation accidents occurring in France. This French law limits the liability of the

carrier in the same manner and in the same amount as does Warsaw, which is the law of this land. If French law were against our public policy, then the Warsaw Convention would be against our public policy. However, the French law is in complete harmony with our public policy. Both the United States and the Republic of France have adopted the Warsaw Convention.

For the reasons stated above, the plaintiffs' motion for partial summary judgment with respect to Air France's three separate and independent defenses —(1) the Warsaw Convention, (2) the contracts between the parties, and (3) the French law—is hereby denied. This partial summary judgment is to control the numbered cases listed in the footnote below.[5]