Nazir B. TARAR, Chingez Tarar, Dilbez Tarar, Akhtar V. Tarar, Jamila Tarar Shami, Farkhanda Tarar, and Seb V. Tarar Jan Mohammad, Plaintiffs,

v.

PAKISTAN INTERNATIONAL AIRLINES, Defendant.

Civ. A. Nos. H–80–639, H–81–1311.

United States District Court, S.D. Texas, Houston Division.

Jan. 18, 1982.

---

Robert Hohenberger, Houston, Tex., Broadus A. Spivey, Spivey & Grigg, Austin, Tex., for plaintiffs.

JoAnn M. Dahl, Eastham, Watson, Dale & Forney, Houston, Tex., Michael J. Holland, Condon & Forsyth, New York City, for defendant.

## MEMORANDUM AND OPINION:

HANNAY, Senior District Judge.

This consolidated suit in international diversity is before this Court under its removal jurisdiction, 28 U.S.C.A. § 1441, by force of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C.A. § 1602 et seq., and under 28 U.S.C.A. § 1330 which authorizes a bench trial in this forum in an action for civil damages against a foreign sovereign.

The defendant Pakistan International Airlines is an agency or instrumentality of the Pakistan national government, the Islamic Republic of Pakistan, a foreign state within the meaning of 28 U.S.C.A. § 1603(a) and (b), and is engaged in a commercial activity carried on in the United States within the meaning of 28 U.S.C.A. § 1605(a)(2). Thus it is suable for civil damages under the Act by that codified statutory waiver of sovereign immunity.

While there is citizenship by most of the parties plaintiffs in Houston, Texas, they are of one family and are natives of the Islamic Republic of Pakistan and intensely devout members of the Islamic religious belief.

The tort action herein is for multi-plaintiff mental pain and anguish caused by the

allegedly negligent intercontinental transportation by jet-aircraft of human remains.

The deceased, Feroze Tarar, who died in Houston, Texas, at the age of 72, was long famed in his native land in the field of letters: journalist, author, poet, linguist, historian, withal "father of the Punjabi language." Before his death in Houston, Feroze Tarar, made known to his closest survivors his wish to be buried in his native village in Pakistan.

The gravamen of this complaint is that under the controlling tenet of the Islamic religious belief, and no evidence has been brought on here to controvert this, any prolonged delay anterior to the burial of a deceased is abhorrent and calculated to disgrace the responsible survivors before the Islamic faithful.

## I.

The Plaintiffs are Nazir B. Tarar, Chingez Tarar, Dilbez Tarar, Akhtar V. Tarar, Jamila Tarar Shami, and Farkhanda Tarar who are residents of Houston, Texas. Plaintiff Zeb U. Tarar Jan Mohammad is a resident of Pakistan.

On May 20, 1979, Feroze Tarar died in Houston, Texas. Feroze Tarar was the husband of Farkhanda Tarar and the father of Chingez Tarar, Dilbez Tarar, Akhtar V. Tarar, Jamila Tarar Shami, Nazir B. Tarar and Zeb U. Tarar Jan Mohammad. The widow and children of Feroze Tarar resolved to respect and carry out his wishes to be buried in Pakistan.

Pakistan International Airlines Corporation (PIA) is an international air carrier, incorporated under the laws of the Islamic Republic of Pakistan. PIA is engaged in the business of transporting persons, cargo, and mail on international routes.

On May 21, 1979, Chingez Tarar, the oldest son of Feroze Tarar, contacted an agent of PIA in Houston, Texas to make arrangements for the transportation of Nazir B. Tarar, Chingez Tarar, Dilbez Tarar, and the casket bearing the remains of Feroze Tarar from Houston, Texas to Lahore, Pakistan. Chingez Tarar informed the agent for PIA

that the passengers were the widow and two sons of the deceased, that the Tarar family were members of the Islamic faith and that, according to their religion, it was imperative that the remains of Feroze Tarar be delivered promptly to Pakistan for burial. The Houston agent for PIA represented to Chingez Tarar that PIA was aware of the Tarar family's concern for the prompt delivery of the casket to Pakistan and that every effort would be made to assure prompt, immediate delivery. The record reflects although the Tarars could alternatively have flown by a direct overseas route from Houston to Pakistan on KLM, a Dutch airline, the PIA agent affirmatively persuaded Chingez Tarar that they would receive better service from PIA because it was the Pakistani national airline. Thereupon the Houston PIA agent made reservations for the Tarars on a PIA flight from New York to Pakistan.

In reliance upon the PIA agent's representations, Chingez Tarar, Nazir Tarar and Dilbez Tarar made reservations with PIA to travel on PIA Passenger Flight No. PK 704, scheduled to depart from John F. Kennedy International Airport in New York at approximately 7:45 p.m. local time on May 22, 1979, and to arrive at Karachi, Pakistan at approximately 3:00 a.m. local time on May 24, 1979. The casket bearing the remains of Feroze Tarar also was to be placed in the cargo section onboard PIA Flight No. PK 704.

Chingez Tarar and Nazir B. Tarar in fact missed their scheduled flight from Houston to JFK. They took a later flight on May 22 from Houston to La Guardia Airport in New York. While Chingez and Nazir Tarar were in route to New York, Jamila Tarar Shami called from her home in Houston to PIA's JFK office and spoke to the witness Rafiq Ahmad. The Court is persuaded by the testimony that Ahmad represented to her that PIA would make arrangements for an ambulance to pick up the casket bearing the remains of Feroze Tarar at La Guardia Airport and transport it to JFK in order that it could be placed onboard Flight No. PK 704. When in fact Chingez and Nazir

Tarar arrived at La Guardia, no ambulance was to be found. After waiting a reasonable period of time for the ambulance to arrive, Chingez Tarar hired a truck to transport the casket to JFK.

Chingez and Nazir Tarar arrived at JFK with the casket at approximately 7:00 p.m. and there rejoined Dilbez Tarar. Chingez Tarar then proceeded to PIA's cargo office to arrange for the loading of the casket onto Flight No. PK 704. When Chingez Tarar arrived at PIA's cargo office, Rafiq Ahmad represented to him that Flight No. PK 704 had not yet left JFK and that PIA would hold the flight until the Tarars and the casket were onboard the aircraft. At 8:49 p.m., Chingez Tarar and PIA's agent, Rafiq Ahmad, executed PIA Air Way bill No. 214–30928054, evidencing PIA's contract with Chingez Tarar for the transportation of the remains of Feroze Tarar from JFK to Lahore, Pakistan. Chingez Tarar was named shipper and consignee on the air waybill.

Flight No. PK 704 of May 22, 1979, was delayed in its departure time from JFK for reasons unrelated to the Tarars' situation. Flight No. PK 704 would not depart JFK until approximately 9:35 p.m. local time on May 22. Prior to the departure of Flight No. PK 704, PIA's agents told Chingez Tarar that the cargo section of the aircraft was closed and that it was too late to load the casket onto the aircraft.

I find and hold that PIA's agents willfully and intentionally refused to load the remains of Feroze Tarar onto Flight No. PK 704 at a time when they could readily have done so. Such refusal was purely a business decision by PIA to avoid the trouble and expense to PIA to load the casket on the aircraft. Such refusal was deliberate and a breach of PIA's previous representation to Plaintiffs that PIA would load the casket onboard the aircraft. This refusal to place the casket onboard Flight No. PK 704 was made with full awareness that it would delay the transportation of the casket to Pakistan by at least 24 hours, because the next available PIA flight was Flight No. PK 804, a cargo flight scheduled

to depart JFK in the evening of May 23, 1979, and scheduled to arrive at Karachi, Pakistan in the morning of May 25, 1979.

Due to this willful decision by PIA to delay the transportation of the casket, Chingez, Dilbez and Nazir Tarar were forced to change their reservations and delay their own departure from New York until the evening of May 23, 1979, when they departed on a KLM flight from JFK to Karachi. They eventually arrived in Karachi sometime in the morning of May 25. The casket was placed onboard PIA Cargo Flight No. PK 804 which departed from JFK at approximately 9:30 p.m. local time on May 23, 1979. Flight No. PK 804 had scheduled stops at Amsterdam, Frankfurt, Zurich, Dubai, and Karachi. The flight was scheduled to arrive in Karachi at 12:30 a.m. local time on May 25, 1979.

When Flight No. PK 804 departed from JFK on May 23, 1979, Rafig Ahmad sent a telex message known as a Flight Load Signal (FLS) to all of PIA's offices at the scheduled stops of Flight No. PK 804, describing the various types of cargo onboard the aircraft and their destinations. The telex specifically notified the PIA offices that the human remains of Feroze Tarar were onboard and destined for Karachi.

The aircraft used for Flight No. PK 804 was a Boeing 707 aircraft owned by British Midland Airways and operated by a crew employed by British Midland Airways. The aircraft was leased to PIA. As opposed to British Midland Airways, PIA at all times had exclusive right to the possession, control, and disposition of the cargo onboard Flight No. PK 804.

Most of the cargo onboard Flight No. PK 804 was ordinary commercial goods. Human remains, however, are not ordinary cargo, and PIA does not treat human remains as commercial goods. PIA, by its own admissions, considers human remains to be an extraordinary shipment which is to be accorded special care and dignity in handling and to be transported in the most prompt and expeditious manner possible. It was PIA's announced policy and herein it was their non-delegable duty to exercise the

highest degree of care and to take every measure to ensure that human remains are not lost, mishandled, misrouted, or otherwise unnecessarily delayed in transportation.

PIA Flight No. PK 804 arrived as scheduled at Schiphol Airport in Amsterdam at approximately 10:10 a.m. local time on May 24, 1979, with the casket bearing the remains of Feroze Tarar onboard. Flight No. PK 804 was scheduled to depart from Amsterdam at approximately 11:30 a.m. local time on May 24, 1979, and to arrive at Karachi, Pakistan at approximately 12:30 a.m. local time on May 25, 1979.

After Flight No. PK 804 landed in Amsterdam, PIA discovered that one of the engines on the aircraft was experiencing mechanical difficulties. PIA and British Midland Airways jointly decided to have the aircraft flown to the maintenance base of British Midland Airways at Derby, England, where British Midland Airways was to remove and replace the malfunctioning engine. British Midland Airways estimated that the aircraft would not be returned to service until approximately 6:00 p.m. local time on May 26, 1979.

PIA knowingly failed and refused to unload or to arrange for the unloading of the casket or any of the other cargo from the aircraft at Amsterdam prior to having the aircraft flown to Derby, England. One of the reasons for PIA's refusal to unload the aircraft was PIA's company policy not to unload an aircraft during an "indefinite delay." Despite the necessity for a complete engine change, and despite the anticipated delay of Flight No. PK 804 until the evening of May 26, PIA classified the disruption of Flight PK 804 as an "indefinite delay."

I find and hold that PIA made a conscious, willful and intentional decision not to remove the casket bearing the remains of Feroze Tarar from the aircraft at Amsterdam. On the basis of the record this was a commercial decision on PIA's part which was made for the purpose of avoiding the time and expense of unloading or readjusting the load on the aircraft. This resulted

in inordinate, unnecessary and avoidable delay in the delivery of the remains of Feroze Tarar to Pakistan. There were alternative flights available on PIA, KLM or other air carriers which could have transported the casket to Karachi from Amsterdam.

PIA's failure to unload the casket from the aircraft in Amsterdam in the circumstances of this case constituted negligence and gross negligence on the part of PIA. I find and hold that PIA's decision not to unload the casket from the aircraft in Amsterdam was voluntary, intentional, and willful. The decision was made with reckless disregard of the fact that it would cause the transportation of the remains of Feroze Tarar to be delayed further and that it would cause grief and anguish to the Tarar family.

PIA willfully chose to relinquish possession of the cargo onboard Flight PK 804, including the casket, and to release it into the custody of British Midland Airways at a time when PIA knew it would be routed to Derby, England. PIA had no scheduled flights to or from Derby, England. British Midland Airways had no contractual relationship with or duty to Chingez Tarar or any of the Plaintiffs.

Early on May 25, 1979, after the aircraft was flown to Derby for repairs, PIA cancelled Flight PK 804. The cancellation was communicated from PIA's office in Karachi to PIA offices in London and Amsterdam. But before Flight PK 804 was cancelled, PIA's Amsterdam office had again been specifically notified, in a "top urgent" message from PIA's Karachi office, that the remains of Feroze Tarar were expected in Pakistan on May 25, that they were delayed onboard Flight PK 804, and that the deceased's relatives were worried. The message directed the Amsterdam office to rush the casket to Pakistan by the first available service; and PIA was at all times aware of the location of the casket bearing the remains of Feroze Tarar.

The casket remained onboard the aircraft at Derby, England from the time of the aircraft's arrival there on May 24, 1979, until approximately 8:20 p.m. on May 26,

1979. Between May 24 and May 26, PIA's agents in Amsterdam and London failed and refused to take such actions as were necessary to have the casket removed from the aircraft at Derby and routed to Pakistan on the first available service.

During the time the aircraft remained at Derby, Chingez, Dilbez, and Nazir Tarar were stranded in Karachi, anxiously awaiting the arrival of each successive PIA flight in hopes that it bore the body of Feroze Tarar. Other relatives of the Tarars took turns waiting at the airport in Lahore, where the body ultimately was to be flown. Still other relatives and friends waited in Feroze Tarar's native village, where the family's funeral and burial plans which were originally scheduled for May 24, were disrupted and indefinitely delayed.

During the period in which Feroze Tarar's body remained at Derby, the Plaintiffs placed numerous phone calls from both Karachi and Houston to PIA offices in Houston, New York, Amsterdam, London, and Karachi, seeking to learn the location and condition of the casket containing Feroze Tarar's remains. The Tarars repeatedly informed PIA's agents at each office that the Tarar family members were suffering from extreme grief, emotional distress and mental anguish due to the fact that the body of Feroze Tarar was missing and his burial indefinitely delayed. PIA's agents repeatedly represented to the Tarars that the casket would be on the "next plane" arriving at Karachi. Several "next planes" arrived at Karachi without the casket. PIA failed to take reasonably prompt action or to use its best efforts to unload the casket from the aircraft in Derby, England for over two days prior to the evening of May 26, 1979.

PIA's failure to unload the casket from the aircraft at Derby prior to the evening of May 26, 1979 constituted negligence on the part of PIA. I find and hold that PIA's failure to unload the casket from the aircraft prior to the evening of May 26, 1979, was voluntary, intentional, and willful, and was done with conscious and reckless disregard of the fact that further unnecessary and avoidable delay in the delivery of the casket to Pakistan would result and that the Tarars would be injured by such delay.

On the evening of May 26, PIA regained custody, control and possession of the body of Feroze Tarar from British Midland Airways. At PIA's request and instructions, the casket bearing the remains of Feroze Tarar was finally transported by truck from Derby to London, England, leaving Derby at approximately 8:20 p.m. local time on May 26, 1979. The casket was eventually transported aboard PIA Flight No. PK 788 departing from London for Karachi at approximately 8:00 p.m. local time on May 27, 1979. The casket arrived in Karachi, Pakistan at approximately 11:00 a.m. local time on May 28, 1979. The casket therefore arrived in Karachi approximately 83 hours later than it was scheduled to arrive on PIA Flight No. PK 804, and approximately 104 hours later than it was originally scheduled to arrive on PIA Flight No. PK 704.

When the casket arrived in Karachi, Chingez and Dilbez Tarar and their mother, Nazir Tarar, had been waiting there for more than three full days. During their stay, PIA provided them with hotel accommodations which were highly inhospitable as demonstrated by the credible evidence. After the casket of Feroze Tarar did arrive at Karachi, Chingez, Dilbez and Nazir Tarar accompanied the casket on a connecting flight to Lahore, Pakistan, where they arrived later on May 28. When the Tarars arrived in Lahore, to their added misfortune, the ambulance which their relatives had rented to carry the casket of Feroze Tarar to his native village was no longer waiting. The Tarars had to lease another vehicle to take them to the village. The casket bearing the remains of Feroze Tarar was finally buried on May 29, 1979.

Because of the already inordinate delay in the transportation of the casket to Pakistan, the Tarars were unable to conduct the customary prayer services for Feroze Tarar. The funeral services and burial were rushed and therefore were unattended by many friends and family members; and because the Tarars were fearful of the condition of

the body after several days in storage on-board the aircraft, there was no customary open-casket service. Because of PIA's delay in the delivery of the casket bearing the remains of her husband to Pakistan, Nazir Tarar clearly suffered physical illness, humiliation, embarrassment, and severe grief, emotional distress and mental anguish. For the same reason, it is clear that such personal injury was done to the remaining family litigants who were resident in Houston, Texas at the time of the demise of the deceased and as to whom there is proof in the record.

The evidence introduced at the trial of this cause therefore plainly demonstrates that Plaintiffs suffered definite grief, mental anguish and emotional distress as a result of the negligent and wrongful acts and omissions of Defendant Pakistan International Airlines. The evidence establishes that PIA contracted with Chingez Tarar for the transportation of the body of Feroze Tarar from the United States to Pakistan for burial. PIA affirmatively convinced the Tarars that they should utilize PIA's services from New York rather than flying on KLM from Houston to Karachi; and PIA further represented to the Tarars that both they and the casket bearing the remains of Feroze Tarar would be assured space onboard Flight No. PK 704 departing from New York's JFK Airport on May 22, 1979.

Chingez, Dilbez, and Nazir Tarar arrived at JFK with the casket in plenty of time to obtain passage on Flight No. PK 704 and were again told that the aircraft would be held for them. But PIA willfully refused to allow the casket to be placed onboard the aircraft, claiming that the cargo section was closed and that it was too late to arrange for the loading of the casket. As a result, the transportation of Feroze Tarar's remains was delayed for a full day until the departure of Flight No. PK 804, a cargo flight on May 23. Because of that delay, the Tarars were forced to change their passenger reservations, and at PIA's behest they booked passage on a KLM flight scheduled to arrive in Karachi on the morning of May 25, 1981 at about the same time as the casket.

When Flight PK 804 did arrive as scheduled at Schiphol Airport in Amsterdam on the morning of May 24, the aircraft developed engine trouble. The aircraft was leased by PIA from British Midland Airways (BMA). PIA and BMA therefore jointly decided to reroute the aircraft to Derby, England, where BMA's maintenance base was located, so that the engine could be changed. PIA could not, of course, have foreseen that Flight No. PK 804 would encounter mechanical problems. But PIA's own telex communications showed that all of PIA's offices along the scheduled route of Flight No. PK 804 were notified in advance by PIA's JFK office that the body of Feroze Tarar was onboard the aircraft. As the national airline of the Islamic Republic of Pakistan, PIA was also and at all material times acutely aware of the deep concern among Moslems for the prompt burial of the remains of a deceased family member. PIA's own self-proclaimed practice, contradicted in this case, would call for the highest duty of care to ensure the prompt and expeditious transportation of Moslemic human remains back to burial in Pakistan.

But rather than unload the casket at Amsterdam and arrange for its transfer to the next available flight to Pakistan on be it PIA, KLM, or some other air carrier, PIA decided to leave the casket onboard the aircraft for an indefinite period of time and to relinquish custody and possession of the aircraft and its cargo to BMA. With BMA Plaintiffs had no privity of contract whatever. PIA's own telexes reveal that the decision to leave the cargo onboard the aircraft was made for the purpose of avoiding the expense of unloading the aircraft in Amsterdam. The testimony of their own agents revealed that the difficulty lay significantly at the known reluctance of other airlines to assume at mid-way the intercontinental carriage of human remains. I find and hold that in refusing to address this contractual duty herein, and this general civil duty, PIA acted with reckless disregard of Plaintiffs' rights and with willful knowledge.

While the body of Feroze Tarar remained in the hangar at Derby for more than two full days, the Tarars had arrived at Karachi on May 25 and, unaware of the reasons for the delay, were awaiting the arrival of the body. Between the morning of May 25 and the ultimate arrival of the casket on May 28, the Tarars suffered grief and anguish. They placed numerous telephone calls to PIA offices intercontinentally in an effort to determine the location of the body and to importune PIA to effect timely delivery. PIA's own telex message from Karachi on May 28 clearly reveals the grief and anguish of the Plaintiffs of which otherwise there is ample proof.

Despite Plaintiffs' pleas and PIA's own continuous exchange of telex messages concerning the whereabouts of the remains of Feroze Tarar, PIA took no action whatever to retrieve the casket from Derby, England, until the evening of May 26, 1979. At that time it was picked up and shipped by truck to London. Another 24 hours passed before the body was placed onboard PIA Flight No. PK 788 which departed London on the evening of May 27. The body arrived at Karachi on May 28, more than four full days (104 hours) later than originally scheduled to arrive on Flight No. PK 704. This was more than three days (83 hours) later than scheduled to arrive on Flight No. PK 804.

## II.

A. The contract for the delivery of the casket to Pakistan involved international transportation. The principal question for the Court therefore is whether the Plaintiffs' causes of action for damages against Defendant PIA are affected or limited by the terms of the Warsaw Convention, 49 Stat. 3000 TS 876, 49 U.S.C. § 1502 note. The Warsaw Convention is an international treaty agreement designed to provide uniformity in the contracting and documentation of transactions for transportation on international air carriers. Although the Court agrees with the contention of Plaintiffs that human remains are not "persons, baggage, or goods" within the meaning of Article 1(1) of the Warsaw Convention and that PIA's own agents testified that PIA does not consider human remains to be ordinary commercial goods, but rather to be accorded special treatment and care by PIA, it is appropriate here to note that Article One of the Warsaw Convention states:

This Convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire.

With respect to the transportation of goods, the Convention provides for the consignor and the carrier to execute an "air waybill" setting forth the particulars of the contract. See Article 5 and Article 8.

The Warsaw Convention is further designed to establish a system of liability on the part of international air carriers for damages arising out of the contract for carriage. Article 19 states:

The carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods.

Article 19 establishes a species of strict liability against air carriers such as PIA. An air carrier is presumed liable for an injury if it is comprehended under the Warsaw Convention and if the otherwise applicable law provides an appropriate basis for the recovery of damages. *Husserl v. Swiss Air Transport Company, Ltd.*, 351 F.Supp. 702 (S.D.N.Y.1972) aff'd, 485 F.2d 1240 (2d Cir.1973); *Maghsoudi v. Pan American World Airways, Inc.*, 470 F.Supp. 1275, 1277 (D.Ha.1979).

In such circumstances, Article 22 of the Convention provides for a specific monetary limitation on the air carrier's liability for damages under Article 19. But that limitation is further subject to the exception set forth in Article 25:

(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as, in accordance with the law of the Court to which the case is submitted, is considered to be equivalent to willful misconduct.

(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.

Therefore, if the delay in the transportation of the casket to Pakistan was caused by the willful acts or omissions of Defendant PIA or its agents, then Plaintiffs are presumptively entitled to recover their damages without regard to any limitation of liability against PIA. See: *Cohen v. Varig Air Lines Inc.,* 62 A.D.2d 324, 405 N.Y.S.2d 44 (1978), citing *Grey v. American Airlines, Inc.,* 227 F.2d 282 (2nd Cir.1955), cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956).

It plainly was foreseeable here to PIA that injury would result to the Plaintiffs from PIA's decisions to delay or defer the transportation of the casket. PIA consciously chose to serve its own commercial interests with reckless disregard of the consequences to the Plaintiffs. I find and hold that the Defendant's failure and refusal to unload the casket from the aircraft with dispatch and to expedite its continued transportation to Pakistan constituted willful acts and omissions for which Defendant PIA is liable without regard to any limitation of liability under the Warsaw Convention.

B. In any event, only the damages suffered by Plaintiff Chingez Tarar can be held subject to the limitation of liability in Article 22 of the Warsaw Convention. Only Chingez Tarar entered into the contract with PIA for the transportation of the casket; Chingez Tarar is listed as the "Consignor" on the PIA air waybill evidencing the contract. Although PIA was aware that Plaintiffs Nazir Tarar and Dilbez Tarar would be traveling to Pakistan to await the arrival of the remains of Feroze Tarar, neither they nor the other Plaintiffs participated in the execution of the contract pertaining to the casket, nor are they listed as parties on the air waybill.

The courts have adopted the view that the Warsaw Convention limitation of liability is a matter of contract; that is, the Convention's terms may be applied only to those persons who have contractually agreed to be bound by them. See *Block v. Campagnie Nationale Air France,* 229 F.Supp. 801, 811 (N.D.Ga.1964); *Kelley v. Sabena Belgian World Airlines,* 242 F.Supp. 129 (E.D.N.Y.1965); *Maghsoudi v. Pan American World Airways,* 470 F.Supp. 1275 (D.Ha.1979). The leading case in this area is *In Re Aircrash in Bali, Indonesia,* 462 F.Supp. 1114 (C.D.Cal.1978). Appeal pending in the Ninth Circuit Court of Appeals. See also: *Adamsons v. American Airlines, Inc.,* 105 Misc.2d 787, 433 N.Y.S.2d 366 (1980).

The Court in *Bali* noted the case law trend toward treatment of the applicability of the limitations of the Warsaw Convention as a matter between the parties to the contract for carriage. Thus, "Since there is no privity between the air carrier and plaintiffs this Court holds that the Warsaw Convention's liability limitation does not apply in the present case." 462 F.Supp. at 1123. The essential rationale of *Bali* is found in its statement at 462 F.Supp. 1125–1126:

> In recent years, the federal public policy towards air carriers has conclusively shifted away from a protective, infant industry approach to a less regulated, market-determined system. As a result, the rationale behind an industry-protective limited-liability approach to airlines accidents, . . . is gone. Rather than having a favored-industry status, airlines are now expected to stand on their own feet in the competitive market. One aspect of this new independence is responsibility for damages caused by its negligence. Modern federal public policy leads to the same result found appropriate by this Court on grounds of the Warsaw Convention's text, the case law, and the Montreal Agreement: An air carrier may avail itself of the liability limitation only if there is a contractual acceptance, either actual or legal, of the limitation by the party against whom the limitation is sought to be imposed.

■ With the exception of Chingez Tarar, the Plaintiffs in the present case were not parties to the contract for carriage of the casket bearing the remains of Feroze Tarar. Each of them has an independent cause of action for the mental anguish and emotional distress caused by the mishandling and delay in the transportation of the casket.

C. As noted above, the Warsaw Convention does not create a cause of action; rather it creates a presumption of liability, and in some circumstances a limitation of such liability, in suits for damages caused by a delay or other deficiency in the transportation of passengers or goods. The injury must be actionable under the law of the forum.

Texas has long recognized a cause of action for mental anguish and emotional distress resulting from the negligent or wrongful mishandling of dead bodies. *Lancaster v. Mebane,* 247 S.W. 926 (Tex.Civ. App.—Texarkana 1923, writ ref'd); *J.E. Dunn and Company v. Smith,* 74 S.W. 576 (Tex.Civ.App.1903, writ ref'd); *Classen v. Benfer,* 144 S.W.2d 633 (Tex.Civ.App.—San Antonio 1940, writ dism'd judgment correct); *Nixon v. Collins,* 421 S.W.2d 682 (Tex.Civ.App.—San Antonio 1967, no writ); See also *Finley v. Atlantic Transport Company,* 220 N.Y. 249, 115 N.E. 715 (1917); *Gostkowski v. Roman Catholic Church of Sacred Hearts of Jesus and Mary,* 262 N.Y. 320, 186 N.E. 798 (1933); *Allen v. Jones,* 104 Cal.App.3d 207, 163 Cal.Rptr. 445 (1980) (damages for mental anguish recoverable from funeral home in tort action arising from defendant's loss of the cremated remains of the plaintiff's brother.)

In *Lancaster v. Mebane, supra,* the wife and mother of the plaintiffs died in El Paso on April 25, 1921. The decedent's son purchased tickets on the defendant's railroad for the transportation of the decedent's remains and the surviving family members from El Paso to DeKalb, Texas. The train made an intermediate stop in Fort Worth, and had all gone according to the contract, the train would have reached DeKalb at about 9:45 a.m. on April 27. However, unbeknownst to the plaintiffs, the corpse was taken from the train by agents of the defendant at Fort Worth and held for transportation to DeKalb by another route. As a result, the corpse didn't reach DeKalb until about 5:50 p.m. on April 27, some eight hours late. This delayed the funeral services and caused mental anguish to the family members. The defendant contended that it could not be held liable for the mental anguish suffered by plaintiffs because defendant had no notice of the interest of the plaintiffs in the performance of the contract according to its terms. However, in light of evidence that the decedent's son had purchased tickets for all of the family members from defendant's agent and had informed him of the circumstances surrounding the transportation of the corpse, the Court held that the defendant was liable for plaintiffs' mental injuries. Apropos to this case, the Court stated:

> The conclusion we have reached is that the facts shown to have been known to appellant's agent were sufficient to put him upon inquiry as to the identity of the persons who were to use the four tickets for DeKalb purchased by appellee's son, and as to the relationship of such person to the deceased.... Therefore, we think, appellants were chargeable with notice of the fact that the corpse was that of appellee's deceased wife, and of the fact that one of the tickets was for use by him in accompanying the corpse to DeKalb, and hence would be held to have contemplated that he would undergo mental suffering if they breached their contract. 247 S.W., at 928.

See also, with respect to the other family members: *Lancaster v. Mebane,* 260 S.W.2d 252 (Tex.Civ.App.—Texarkana 1924), *Lancaster v. Mebane,* 260 S.W.2d 256 (Tex.Civ. App.—Texarkana 1924), and *Lancaster v. Marshall,* 260 S.W. 259 (Tex.Civ.App.—Texarkana 1924).

■ In the present case, Defendant PIA's agents were fully aware of the fact that several of the Plaintiffs had purchased passenger tickets for transportation from Houston to Pakistan, and that the Tarar family had an interest in the prompt transportation of the casket bearing the remains of Feroze Tarar pursuant to the contract for carriage entered into between Chingez

Tarar and PIA. The breach by PIA of that contract for carriage, and the negligence of PIA in failing to unload the casket from the aircraft for prompt delivery to Pakistan after the intermediate stop in Amsterdam, had the foreseeable and avoidable consequence of causing injury to Plaintiffs.

### III.

Based upon the foregoing, I find and hold that the Defendant Pakistan International Airlines is liable in civil damages to the following Plaintiffs in the following amounts:

1. To the widow, Farkhanda Tarar, the amount of $10,000.00.

2. To the eldest son, Chingez Tarar, the amount of $10,000.00.

3. To Nazir Tarar, who accompanied Chingez Tarar from Houston,Texas by way of New York to Pakistan, the amount of $10,000.00.

4. To the son, Dilbez Tarar, the amount of $5,000.00.

5. To Akhtar U. Tarar, the amount of $5,000.00.

6. To Jamila Tarar Shami, the amount of $5,000.00.

The foregoing shall constitute Findings of Fact and Conclusions of Law.