Burke, J.
Defendant’s motion to dismiss the complaint under article 28 of the Warsaw Convention[1] was denied by Special Term. The Appellate Division reversed on the law, holding that New York is not one of the jurisdictions where suit may be brought under the Warsaw Convention and dismissed the suit for lack of jurisdiction.
After reading all of the provisions of the Warsaw Convention and applying the purposes disclosed therein to the conditions under which the carriers operate in this Jet Age, we have concluded that the requirements of subdivision (1) of article 28 so far as the Convention may be applicable are fully met and that the action will lie in the courts of New York.
Plaintiff, a California resident, was a member of the Far West Ski Association, which contracted with Scandanavian Airlines System (SAS) on her behalf for passage in the early part of 1962 by air from Los Angeles to several countries in Europe, *58 finally returning to Los Angeles. Plaintiff also arranged with the Oakland, California, office of SAS for the purchase of tickets for a side air trip while she was abroad between several cities in Europe and the Middle East. One of the flights listed in the ticket SAS obtained for the plaintiff was to be on defendant United Arab Airlines Flight No. 796 from Jerusalem to Cairo. Subsequently plaintiff was injured when Flight No. 796 crashed on March 16, 1962 in Wadi Haifa, Sudan, a place not scheduled as a stop on the flight, but where the pilot was diverted in an attempt to avoid bad weather at Cairo.
The defendant carrier maintains a place of business, a ticket office, in New York City. This office would have sold the plaintiff passage on the same United Arab Airlines flight that SAS ticketed her on. When the defendant opened its United States office in New York it anticipated that it would be amenable to suits there for claims arising out of any carriage sold by that office. If the plaintiff had purchased her ticket in that office the defendant would have to concede jurisdiction to our courts. But by happenstance the plaintiff made her purchase of a seat on Flight No. 796 in the SAS office which for our purposes could have been right next door. (See Pitman v. Pan American World Airways, 223 F. Supp. 887 [U. S. Dist. Ct., E. D. Pa., 1963]). Since this defendant set up a place of business in the United States it anticipated the burden of defending possible suits in the United States courts. Surely the chance circumstance of where the plaintiff made her purchase of the ticket within the territory of the high contracting party should not relieve the airline of the burden of litigation here when it expects to defend suits on similar contracts originating in its New York office.
It is argued that article 28 expressly provides that a place of business, other than a principal place of business, outside the domicile of the carrier, will support jurisdiction only if the contract of carriage was made through that office. Defendant quotes that part of the article that, it asserts, places jurisdiction in the court “ in the territory of one of the high contracting parties * * * where he [the carrier] has a place of business through which the contract has been made This is the basis for the result reached by the Appellate Division.
The crux of the problem is that the Appellate Division reached its conclusion by applying mechanically the literal translation *59 of a phrase without an analysis of the treaty. The court overlooked the canon that, when a treaty is invoked, what is to be applied are its principles if its purposes are to be observed presently as in the past. (Valentine v. United States ex rel. Neidecker, 299 U. S. 5, 10 [1936]; Maximov v. United States, 373 U. S. 49, 54 [1963].) The reasoning which supports a strictly literal reading of the phrase might not have done violence to the over-all scheme and design of the Convention under the conditions existing when the treaty was drafted. At that time[2] it would have been in harmony with the methods under which the carriers were operating and with the objectives of the Convention. (Strother v. Lucas, 12 Pet. [37 U. S.] 410, 428 [1838].) Now, however, almost a half century later, when the carriers have radically changed their methods of booking passage, the whole scheme of the treaty in relation to international air travel makes it imperative to analyze this self-executing treaty in assigning meaning to any part of it. In doing this it must be recognized that the literal wording of one particularly applicable section of the entire treaty should not set the limits of our interpretive examination. (Choctaw Nation v. United States, 318 U. S. 423, 432 [1943].) The proper procedure now is to examine the treaty as a whole, along with its history, and, in particular, to look into the problems which it was intended to solve.
This process displays the purposes underlying the treaty’s adoption. The over-all principle of the Convention was one of allowing only a regulated burden to be the responsibility of the then struggling carriers. The purposes were to provide uniform rules of limitation concerning the liability of international air carriers to their passengers and to provide a uniform remedy for these passengers to the extent that this remedy would not burden the carrier more than the Convention provisions allowed. These principles were expected to be operative with respect to conditions developing after the enactment of the Convention. In this light, the particular wording of article 28, with which we are here concerned, appears to have been intended to limit *60 the bringing of suits to only those forums where the terms of the Convention were in force and would be applied. Moreover, the intent was to avoid suits in countries where the carrier had no office for the making of transportation contracts and where no passage on the carriers’ aircraft had been purchased.
Allowing this suit does not run contrary to the 'Convention’s provisions. Bather it gives a meaningful effect to the underlying principles by applying them to the realities of international air travel in these times. In 1926 these principles were put into a specific written formula which was meant to deal not only with the circumstances of an infant industry in that era but also accommodate itself consistently to changing conditions as the industry grew. The formula did not speak to the right to sue belonging to a traveler who purchased passage on one carrier from another carrier in a country where the first carrier itself maintained an office, because such a procedure was unknown. Travel agents and connecting carriers then cleared the bookings through the local officers. At the time of the enactment of the Convention, if a carrier had a ticket office in any particular country it would be a very exceptional case if the carriage was not booked through the airline’s office there. Hence the phrase relied on by respondent then meant the office through which, in the ordinary course of business, the contract would be made. Today the volume of business done by the carriers requires a vast network of international communications and other ticket routing procedures — procedures not possible when this article was drafted in Paris in 1926, and ratified by this country in 1934.
By changing their ticket routing methods the carriers cannot deprive the purchasers of tickets in a territory of a high contracting party, where the carrier has an office, of access to courts in that jurisdiction as that would be in conflict with the basic intent that the remedy for passengers similarly situated was to remain constant. Had the selling carriers continued to clear the bookings through the local office of the ultimate carrier there would be no question. ■ If the drafters of the treaty intended to discriminate against a passenger who purchased a ticket in a territory where the carrier had an office, but which the ultimate carrier decided should be cleared through an office outside that territory, such an intention should have been expressed. It cannot be implied, as such a change would take from the pas *61 sengers, without notice, the very relief which the treaty gave them and intended that they continue to have. (Jordan v. K. Tashiro, 278 U. S. 123, 127 [1928].) A literal interpretation of the single clause in the Convention, therefore, is at odds with the tenor of the document. It deprives it of the force it was intended to have because such a construction of the 'Convention is anachronistic. It would, by limiting the meaning of the provisions to the situation in 1926, substitute discrimination in our day for the equable treatment of passengers achieved when the Convention was accepted by the signatories. The interpretation given to the Convention by the Appellate Division would allow a passenger who purchased transportation through United Arab Airlines office in New York City to sue here, but compel a copassenger in the same accident who purchased transportation through another carrier in New York City in the same block to go abroad to bring suit. This construction rejects the fundamental rule set forth in the Convention.
Throughout subdivision (1) of article 28 the emphasis is on the distinction between absence or presence of the carrier in a territory, i.e., “domicile”, “place of business ”, “destination ”. By the use of the words “ where he has a place of business through which the contract has been made,” the treaty barred a suit in a place where only a ticket was sold and where the carrier did not have an office. The clause also forbids a suit in a territory where the carrier had an office if the ticket was not purchased in that territory. (On this point see Calkins, The Cause of Action Under the Warsaw Convention, 26 J. Air L. & Com. 217 [1959] and quotations from the minutes of the 1929 Convention reported there at 229-231.) But because the place of business and the place of contracting were at that time in a single office, the phrase dealing with only known circumstances should not be read as exclusive. The treaty when interpreted so as to effectuate the obvious purpose of the contracting powers does not go as far as to exclude a suit in a particular area if the carrier has an office there and the ticket had been purchased in that particular area, or in another part of the territory of a high contracting party. An authorized venue is provided when there is a place of business in the territory and the sale of a ticket is closed within the territory. Such an application of the treaty parallels the express provisions. It does not contradict *62 them. The application given to the words of the treaty by the respondent, although literal, effects a result contrary to the aims of the Convention because it unreasonably discriminates against a passenger of the airline by reasoning which was only valid while the carriers conducted their business in the manner dictated by a state of affairs existing in aviation almost 40 years ago. (Asakura v. City of Seattle, 265 U. S. 332 [1924].)
The preference of this court for being faithful to purpose rather than coldly literal is well established. In the case of Matter of River Brand Rice Mills v. Latrobe Brewing Co. (305 N. Y. 36 [1953]) we said: “ ‘ A thing which is within the letter of the statute is not within the statute unless it be within the intention of the lawmakers, but a case within the intention of a statute is within the statute, though an exact literal construction would exclude it. It is a further legal maxim that "he who considers merely the letter of an instrument goes but skin deep into its meaning ’ ’ and all statutes are to be construed according to their meaning, not according to the letter.’” (305 N. Y., pp. 43-44.) In the case of Matter of New York Post Corp. v. Leibowitz (2 N Y 2d 677 [1957]) Judge Fuld wrote: “ In construing statutory provisions, the spirit and purpose of the statute and the objectives sought to be accomplished by the legislature must be borne in mind.” (2 N Y 2d, p. 685.) Judge Dye has pointed out that the “ literal meanings of words are [not] to be adhered to or suffered to defeat the general purpose and manifest policy intended to be promoted”. (Matter of Capone v. Weaver, 6 N Y 2d 307, 309 [1959].)
The provisions can be read in an excessively literal manner, but it is unreasonable to think that the signatories intended such an unwarranted construction. We will not deny the plaintiff the right to sue here since the purposes of the Convention in respect to consistency of remedy must be heeded, and analogous cases should be dealt with in a similar fashion.
For the reasons stated herein, we disagree with the decision in Eck v. United Arab Airlines, S. A. A. (241 F. Supp. 804).
Accordingly, the order of the Appellate Division should be reversed and the motion to dismiss the complaint should be denied, and the action remanded to the Supreme Court for further proceedings.

. “An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.” (49 U. S. Stat. [pt. II], 3000-3014, 3020, emphasis added.)

. When the Convention was originally drafted in 1926, Charles Lindbergh had not flown to Paris. When it was first adopted Air France had two overseas flights, one from Paris to London and the other from Marseilles to Tunis. Pan American flew from Key West to Havana. The China Clipper flight on Pan American did not take place until 1935, after the United States had become a signatory to the Warsaw Convention in 1934.