Vincent J. KELLEY, individually and as Administrator of the Estate of Gregory E. Kelley, deceased and Nathalie M. Kelley, Plaintiffs,

v.

SOCIETE ANONYME BELGE D'EXPLOITATION de la NAVIGATION AERIENNE, d/b/a Sabena Belgian World Airlines and Boeing Airplane Company, Defendants (and twenty-four other actions).

Civ. A. Nos. 61C993, 61C994, 61C1031–33, 61C88–90, 62C130, 62C131, 62C151–56, 62C161, 62C162, 62C135, 62C409, 62C548, 63C363, 63C392, 63C394, and 63C396.

Consolidated with 61C993 by order entered April 30, 1962.

United States District Court
E. D. New York.

April 12, 1965.

Appeal Denied May 3, 1965.

Berman & Frost, Emile Zola Berman, New York City, of counsel, Cahill, Gordon, Brindel & Ohl, Jerome Doyle, Henry G. Bisgaier, New York City, of counsel, Kreindler & Kreindler, Lee S. Kreindler, Stanley J. Levy, Jules Brody, New York City, of counsel, Speiser, Shumate, Geoghan & Law, Edward M. O'Brien, New York City, of counsel, for respective plaintiffs.

Haight, Gardner, Poor & Havens, New York City, William J. Junkerman, Peter L. Dawson, New York City, of counsel, for defendant Sabena Belgian World Airlines.

ZAVATT, Chief Judge.

Twenty-nine separate actions, each arising from the same basic facts, have been consolidated with the instant action for the alleged wrongful death of thirty passengers for hire aboard the ill-fated Sabena Flight 548 which crashed in the vicinity of Brussels Airport in Berg, Belgium, on February 15, 1961. All of said actions have been assigned to me for all purposes pursuant to Rule 2 of the General Rules for the Southern and Eastern Districts of New York. Societe Anonyme Belge D'Exploitation de la Navigation Aerienne (hereinafter Sabena) has been named as a defendant in twenty-five of these actions while the manufacturer of the airplane, Boeing Airplane Company (hereinafter Boeing) has been named as defendant in twenty-seven. Jurisdiction of this court is based upon the diversity of citizenship existing between the parties hereto—the plaintiffs being citizens of various states of the United States; the defendant Sabena being a Belgian corporation with its principal place of business in Brussels, Belgium; and the defendant Boeing being a Delaware corporation with its principal place of business in the State of Washington. The instant opinion concerns only those actions, twenty-five in number, in which the carrier Sabena is named as a defendant. The plaintiffs in those actions have moved to dismiss the affirmative defenses in and by which Sabena, in its several answers to the complaints, has pleaded the Warsaw Convention, 49 Stat. 3000 (1934), as a partial defense.

Each of the passengers was travelling on a round trip ticket from points within the United States to Brussels and other cities within Europe and return to the United States. For example, passenger Kelley's ticket covered the following itinerary: New York to Brussels to Prague to Zurich to Paris to Brussels to New York. It was on the first leg of this round trip that the crash occurred, as the plane was approaching its landing at Brussels.

In the multiclaim amended complaint, the plaintiffs set forth several basic theories of recovery against the defendant Sabena, including negligence, wilful misconduct and breach of contract. Some of the claims state that the action arises under the Convention for the Unification of Certain Rules Relating to International Transportation by Air, otherwise known as the Warsaw Convention (hereinafter Convention), while others treat the action as being wholly separate and apart from the Convention. Sabena pleads that any liability it may have must be determined in accordance with the terms of the Convention. In light of its crucial bearing upon the further progress of this case, it has been

agreed that this preliminary issue should be determined at this juncture. The present opinion, therefore, deals with only one aspect of the case against Sabena, i. e., the applicability of the Convention (and its monetary limitation of recovery) to the facts of these cases.

The Convention is a multination agreement designed to regulate "in a uniform manner the conditions of international transportation by air in respect of the documents used for such transportation and of the liability of the carrier." Reduced to its most elementary form, it provides that in all cases, other than those involving the "wilful misconduct" of the carrier, there shall be a presumption of liability on the carrier and a monetary limitation of approximately $8,300 upon the recovery which may be had by a passenger or one suing on his behalf. It is this latter aspect of the Convention that the plaintiffs seek to avoid. Their contention that the Convention is inapplicable may be summarized as follows:

1. The Convention is, by its very nature, reciprocal and cannot be applied so as to extend protection to a carrier which is a citizen of a nonratifying, nonadhering power.

2. Belgium, owing to a fatal variation from the terms of the Convention in its purported ratification by the Law of April 7, 1936, did not effectively ratify the Convention and was not bound thereby at the time of the accident.

3. This court, therefore, may not apply the Convention to this case, since to do so would result in an extension of the protection of the Convention to Sabena, a citizen of a nation which is not bound thereto.

There are additional arguments set forth by the plaintiffs to defeat application of the Convention's limitation of $8,-300 to the facts of this case which will also be considered. But for the reasons hereinafter stated, this court is constrained to find that the Convention is applicable, and that the liability of the defendant Sabena must be determined in accordance with the terms thereof.

*The Convention and its Ratification*

The Convention was concluded in Warsaw, Poland, on October 12, 1929. Article 1 thereof provides that:

"(1) This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.

"(2) For the purposes of this convention the expression 'international transportation' shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty mandate or authority of another power, even though that power is not a party to this convention. Transportation without such an agreed stopping place between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention."

With regard to such "international transportation," Article 17 of the Convention provides that:

"The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

This presumption of liability is coupled with a monetary limitation upon recovery in all cases other than those involving the "wilful misconduct" of the car-

rier under Article 25(1). This limitation of damages is set out in Article 22:

"(1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.

 \* \* \* \* \* \*

"(4) The sums mentioned above shall be deemed to refer to the French franc consisting of 65½ milligrams of gold at the standard of fineness of nine hundred thousandths. These sums may be converted into any national currency in round figures."

The Convention further provides:

"Article 24

"(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

"(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights."[1]

"Article 37

"(1) this convention shall be ratified. The instruments of ratification shall be deposited in the archives of the Ministry for Foreign Affairs of Poland, which shall give notice of the deposit to the Government of each of the High Contracting Parties.

"(2) As soon as this convention shall have been ratified by five of the High Contracting Parties it shall come into force as between them on the ninetieth day after the deposit of the fifth ratification. Thereafter it shall come into force between the High Contracting Parties which shall have ratified and the High Contracting Party which deposits its instrument of ratification on the ninetieth day after the deposit.

"(3) It shall be the duty of the Government of the Republic of Poland to notify the Government of each of the High Contracting Parties of the date on which this convention comes into force as well as the date of the deposit of each ratification."

"Article 38

"(1) This convention shall, after it has come into force, remain open for adherence by any state.

"(2) The adherence shall be effected by a notification addressed to the Government of the Republic of Poland, which shall inform the Government of each of the High Contracting Parties thereof.

"(3) The adherence shall take effect as from the ninetieth day after the notification made to the Government of the Republic of Poland."

The United States did not actively participate in the negotiation of the Convention and was not one of the original signatories thereto. This nation did, however, deposit its Declaration of Adherence thereto on July 31, 1934; the Convention coming into force with regard to this country ninety days later, October 29, 1934. Belgium, on the other hand, was one of the original signatories to the Convention but took no formal action towards ratification until passage of the Law of April 7, 1936. This Law, enacted by the Houses and signed by the

---

[1]. Articles 18 and 19 relate to liability for loss of or damage to baggage, and damages occasioned by delay in transporta- tion. They are not, therefore, pertinent to the narrow question now before the court.

King, the Ministry of Foreign Affairs and of Foreign Trade, as well as the Minister of Justice, provided:

"LEOPOLD III, King of the Belgians

The Houses have adopted and We give our assent to the following:

*Article 1.* The International Convention for unification of certain rules concerning International Air Transportation and the Supplementary Protocol of this act, signed in Warsaw on October 12, 1929, will become effective in its entirety.

*Article 2.* As long as the Convention remains in effect, as far as Belgium is concerned, Belgians as well as foreigners may take advantage of its terms and conditions. Such terms and conditions should apply to any and all transportation of persons, baggage or cargo effectuated under the terms of the Convention, even when the point of departure and point of destination are located on Belgian territory.

*Article 3.* For transportation governed by the said Convention as well as for transportation within the country, in conformity with Article 2 above, the carrier's liability, governed by Article 22 of the Convention, is limited to 250,000 francs per passenger, 500 francs per kilogram of registered baggage and cargo, and 10,000 francs per passenger for unchecked articles in his possession.

We hereby promulgate this law and order that the seal of the State be affixed to it and that it be published in the 'Moniteur.'

Brussels, April 7, 1936

LEOPOLD

By the King, the Ministry of Foreign Affairs and of Foreign Trade,

P. van ZEELAND

The seal of the State is affixed hereto,

The Minister of Justice,

E. SOUDAN" [2]

(Moniteur Belge no. 268 of Thursday, September 24, 1936)

On July 13, 1936, three months after the above Law was promulgated, the following instrument, dated May 26, 1936, was deposited by Belgium with the Polish Government:

"LEOPOLD III, King of the Belgians to all those present or to come, GREETINGS

Having seen and examined the Convention for the unification of certain rules relating to international transportation by air and the additional Protocol, signed at Warsaw, on October 12, 1929, by Our Plenipotentiary furnished with full special powers together with Plenipotentiaries equally furnished with full powers properly and duly given by the Sovereigns and Chiefs of signatory States, acts the tenor of which follows:

'the acts follow'

We, finding agreeable the acts which precede, approve, ratify and confirm them, promising to have them observed, according to their form and tenor, without permitting that they be contravened in any manner whatsoever.

In witness whereof We have signed these present letters of ratification and have affixed thereto Our royal seal.

Done at Brussels, on May 26, 1936

/s/ Leopold III

---

**2.** The significance of 250,000 Belgian francs, in this Law of April 7, 1936 and the 125,000 French gold francs provided for in Article 22(1) of the Convention is considered infra.

BY THE KING:

The Prime Minister, Minister of Foreign Affairs and Foreign Trade,

/s/ P. van Zeeland"

The court has been informed by the United States Department of State and the Belgian Minister of Foreign Affairs that the original instrument filed July 13, 1936, as well as the major part of the Polish archives at Warsaw, was destroyed during the Second World War. The preceding text, however, is an English translation of a photostat of the duplicate of said document which has been on file in the Belgian archives at Brussels. Said photostatic copy is certified by the Belgian Minister of Foreign Affairs, P. H. Spaak. Minister Spaak, in a covering letter accompanying this certified copy, states that:

"The only difference between this document and the document deposited with the Polish Government in 1936, is that the copy attached hereto does not quote the text of the Convention and of the Additional Protocol.

However, there is no doubt that the text of the Convention and of the Additional Protocol was inserted in the instrument deposited in Warsaw; the Minutes mentioned above are explicit on this subject."

The Minutes referred to by Minister Spaak reveal that the Polish Government, in conformity with the procedure provided by the Convention, issued the following Procès-Verbal:

"PROCÈS–VERBAL

of the deposit of the instrument of ratification of the Convention for the unification of certain rules relating to international transportation by air and of the additional Protocol, signed at Warsaw on 12 October 1929.

Conforming to the resolutions of Art. 37 of the Convention for the unification of certain rules relating to international transportation by air, signed at Warsaw on 12 October 1929, His Excellency Mr. Alexandre Paternotte de la Vaillée, Extraordinary Envoy and Plenipotentiary Minister of Belgium at Warsaw presented himself today at the Palace of the Ministry of Foreign Affairs, in order to proceed to the deposit of the instrument of ratification from His Majesty the King of the Belgians concerning the said Convention and the annexed Additional Protocol.

This instrument of ratification having been, after examination, found accurate and concurring with the original of the said Convention, has been entrusted to the Government of the Republic of Poland, in order to remain deposited with the present procès-verbal in its archives.

According to the terms of Para. 2 of Article 37 of the above mentioned Convention, it will become effective with the annexed Additional Protocol for Belgium on the 90th day after the date of deposit of the said instrument of ratification.

In witness whereof, the undersigned have drawn up the present Procès-verbal in a single original, a certified conformed copy of which will be sent to the Government of each High Contracting Party.

Done at Warsaw, 13 July 1936.

(___) Szembak (___) A. Paternotte de la Vaillée."

Pursuant to Article 37(3) of the Convention, the Government of Poland notified our Government of Belgium's actions in a letter dated September 22, 1936:

"The Ambassador of Poland presents his compliments to the Secretary of State and has the honor to inform him that an instrument of ratification of the Convention for the unification of certain rules relating to international transportation by air and of its supplementary protocol signed in Warsaw, October 12, 1929, has been deposited on July 13, 1936,

with the Polish Government by the Belgian Government.

"The adherence of Belgium to the above mentioned Convention and to its supplementary protocol will become effective, in accordance with paragraph 3, article 38 of the Convention, ninety days after July 13, 1936.

"A certified copy of the duly executed Protocol in the above matter is being enclosed herewith." [3]

The Secretary of State acknowledged receipt of this notification by his letter of September 25, 1936:

"The Secretary of State presents his compliments to His Excellency the Ambassador of Poland and has the honor to acknowledge, with thanks, the receipt of the Ambassador's note of September 22, 1936, advising of the deposit with the Polish Government on July 13, 1936, of the instrument of ratification by the Belgian Government of the Convention for the Unification of Certain Rules Relating to International Transportation by Air and of its supplementary protocol, signed at Warsaw October 12, 1929, and that the convention and its supplementary protocol will become effective with respect to Belgium ninety days after July 13, 1936, in accordance with paragraph 3 of Article 38 of the convention.

"The receipt is acknowledged also of a certified copy of the procès-verbal of deposit, of which due note has been taken in the Department of State."

*Power of the Court to Construe the Convention*

 The court has the power to examine this treaty and construe its provisions insofar as they may relate to the facts of this case. Indeed, it has always been the function of the judiciary to construe a treaty, as it would any other contract, Sullivan v. Kidd, 254 U.S. 433, 439, 41 S.Ct. 158, 160–161, 65 L.Ed. 344 (1921); Rocca v. Thompson, 223 U.S. 317, 331–332, 32 S.Ct. 207, 210, 56 L.Ed. 453 (1912); Board of County Comm'rs of Dade County, Fla. v. Aerolineas Peruanasa, S.A., 307 F.2d 802, 806 (5th Cir. 1962), cert. denied, 371 U.S. 961, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963); Hidalgo County Water Control and Improvement District No. 7 v. Hedrick, 226 F.2d 1, 7 (5th Cir. 1955), cert. denied, 350 U.S. 983, 76 S.Ct. 469, 100 L.Ed. 851 (1956); looking to the intent of the parties and the purpose to be achieved, Maximov v. United States, 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963), affirming, 299 F.2d 565, 568 (2d Cir. 1962); Factor v. Laubenheimer, 290 U.S. 276, 293–294, 54 S.Ct. 191, 195–196, 78 L.Ed. 315 (1933); Sullivan v. Kidd, supra, 254 U.S. at 439, 41 S.Ct. at 160–161; Rocca v. Thompson, supra; Wright v. Henkel, 190 U.S. 40, 57, 23 S.Ct. 781, 785, 47 L.Ed. 948 (1903); as evidenced by the treaty itself, Maximov v. United States, supra; and the negotiations leading thereto, Choctaw Nation of Indians v. United States, 318 U.S. 423, 431–432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943); Factor v. Laubenheimer, supra; so as to give a sensible meaning to all of the provisions thereof, if that be practicable. Sullivan v. Kidd, supra; De Geofroy v. Riggs, 133 U.S. 258, 270, 10 S.Ct. 295, 298, 33 L.Ed. 642 (1890). In so doing, the courts are to give substantial weight to the construction, if any, which is placed upon the treaty by the political branch; however, they are not required to abdicate what is basically a judicial function. Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); Factor v. Laubenheimer, supra; Sullivan v. Kidd, supra;

---

3. "The High Contracting Parties reserve to themselves the right to declare at the time of ratification or of adherence that the first paragraph of article 2 of this convention shall not apply to international transportation by air performed directly by the state, its colonies, protectorates, or mandated territories, or by any other territory under its sovereignty, suzerainty, or authority." Reference to this Protocol is made infra.

Charlton v. Kelly, 229 U.S. 447, 468, 33 S.Ct. 945, 952, 57 L.Ed. 1274 (1913); Argento v. Horn, 241 F.2d 258, 263 (6th Cir.), cert. denied, 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35 (1957); United States v. Reid, 73 F.2d 153, 156 (9th Cir. 1934), cert. denied, 299 U.S. 544, 57 S.Ct. 44, 81 L.Ed. 400 (1936); The Sophie Rickmers, 45 F.2d 413, 418 (S.D.N.Y.1930).

Our courts have examined this Convention to determine, among other things, whether protection is to be afforded a carrier which is a citizen of a nonadherent, Glenn v. Compania Cubana De Aviacion, S.A., 102 F.Supp. 631 (S.D. Fla.1952); whether it applies where both the carrier and the passenger are of the same nationality, Garcia v. Pan American Airways, Inc., 269 App.Div. 287, 55 N.Y.S.2d 317 (2d Dep't 1945), aff'd per curiam, 295 N.Y. 852, 67 N.E.2d 257 (1946); whether it applies to charter flights, Block v. Compagnie Nationale Air France, 229 F.Supp. 801 (N.D.Ga. 1964); whether it conflicts with our Constitution, Pierre v. Eastern Air Lines, Inc., 152 F.Supp. 486 (D.N.J.1957); whether it is self-executing, Indemnity Ins. Co. of North America v. Pan American Airways, Inc., 58 F.Supp. 338 (S.D. N.Y.1944); whether venue is properly laid in a particular state, Eck v. United Arab Airlines, Inc., 20 A.D.2d 454, 247 N.Y.S.2d 820 (1st Dep't), rev'd, 15 N.Y. 2d 53, 255 N.Y.S.2d 249, 203 N.E.2d 640 (1964); whether it applies to round trip flights leaving from and returning to a point within a single adhering nation. See, e. g., Garcia v. Pan American Airways, Inc., supra.

### Did Belgium Ratify the Convention?

 The parties are in disagreement, however, as to the power of this court to determine whether or not Belgium had effectively ratified the Convention as of February 15, 1961. Sabena contends that the ratification or nonratification by Belgium is a "political" question and that this court is without jurisdiction to conclude that Belgium's attempted ratification was ineffective. Although "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962) it is apparent that the court's jurisdiction with regard to the instant question is not without its limits. For example, it is still true, as it was over one hundred years ago when our Supreme Court decided Doe ex dem. Clark v. Braden, 57 U.S. (16 How.) 635, 14 L.Ed. 1090 (1853), that the judicial branch is without power to determine whether a head of state who entered into a treaty with the United States was empowered, by the laws of his nation, to do so. This because:

> "it would be impossible for the Executive Department of the government to conduct our foreign relations with any advantage to the country, and fulfill the duties which the Constitution has imposed upon it, if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its Constitution and laws, to make the engagements into which he entered." 57 U.S. (16 How.) at 657, 14 L.Ed. at 1099.

Cf. Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); Terlinden v. Ames, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902). Thus, if the facts of this case were such as to indicate that Belgium had not effectively ratified the Convention in 1936, it would be incumbent upon this court, through

> "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action," Baker v. Carr, supra, 369 U.S. at 211–212, 82 S.Ct. at 707,

to first determine whether it possesses the jurisdiction to so hold. An examination of this type, however, is made unnecessary by the facts of this case—facts

which clearly show that Belgium effectively ratified the Convention by depositing a valid instrument of ratification on July 13, 1936.

■ The Convention was originally drawn in 1926—a time at which international carriage by air was still in its infancy. As recently noted by the New York Court of Appeals:

"When the Convention was originally drafted in 1926, Charles Lindbergh had not flown to Paris. When it was first adopted Air France had two overseas flights, one from Paris to London and the other from Marseilles to Tunis. Pan American flew from Key West to Havana. The China Clipper flight on Pan American did not take place until 1935, after the United States had become a signatory to the Warsaw Convention in 1934." Eck v. United Arab Airlines, Inc., supra, 15 N.Y.2d at 59 n. 2, 255 N.Y.S.2d at 251, 203 N.E.2d at 641 n. 2 (1964).

In order to protect this emerging industry, and to secure uniformity of recovery to passengers, the signatories framed Article 22 which provides that "the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs." It further provides that this sum is deemed to refer to "the French franc consisting of 65½ milligrams of gold at the standard of fineness of nine hundred thousandths." Under present rates of exchange, then, the maximum liability under Article 22 of the Convention is approximately $8,300 American dollars. (As will be discussed below, this sum has been doubled by the Hague Protocol of 1955 with respect to those nations which adhere thereto. The United States is not, however, such an adherent, although Belgium is).

Under the terms of the Convention, this monetary limitation applies only to "international" air carriage. Many nations have chosen, however, to legislate similar restrictions with regard to domestic flights; indeed, one commentator notes that:

"The inherent merits of the Convention, moreover, are exemplified by the fact that its rules have been adopted by various states for the regulation of the carrier's liability in domestic air transport." Mankiewicz, Hague Protocol to Amend the Warsaw Convention, 5 Am.J. Comp.L. 78, 79 (1956).

Some nations found it necessary, under their domestic law, to pass enabling statutes prior to actual ratification. For example, in 1932 Great Britain passed the Carriage By Air Act, 22 & 23 Geo. 5, c. 36, "the object of the Act being to make provision for giving effect to the Warsaw Convention in English law. The Act was, of course, no more than an 'enabling statute' and it was not until May 15, 1933, that the Convention actually came into force as between the United Kingdom and the other High Contracting Parties to the Convention." Forrest, Carriage By Air: The Hague Protocol, 10 Int'l & Comp.L.Q. 726 (1961).

Within this context the court must ascertain the nature of Belgium's Law of April 7, 1936, set out on pages 10–11, supra. For it is upon this Law, *and it alone,* that plaintiffs base their contention that Belgium, having made an unauthorized reservation to the Convention in its purported ratification, was not a party thereto at the time of the instant air crash. It is apparent from the legislative history of this Law that the Belgian Chamber of Representatives and the Belgian Senate intended to do three things: (1) approve the Convention; (2) make it applicable to internal air transportation and (3) convert the Convention monetary standard into its equivalent in Belgian francs applicable to "international transportation" under the Convention as well as to domestic transportation.

On March 28, 1934, the Chamber of Deputies approved a bill in the language

cf what later became Article 1. When this bill was sent to the Senate, an amendment thereto was proposed in the language of what later became Article 2. (Doc.Parl., Sènat, 1933–1934, No. 153). The Senate also proposed an amendment to convert the pecuniary damage limitations of the Convention into 180,000 Belgian francs [4] (Annales Parl., Sènat, 1933–1934, pp. 1099–1100) and returned the bill, as so amended, to the Chamber of Deputies. The Chamber Committee on Foreign Affairs reported out the bill as so amended (Doc.Parl., Chamber, 1935, No. 179). Before the Chamber voted on the bill, however, the Belgian franc was devalued and, therefore, the bill was amended by the Chamber to increase the number of Belgian francs from 180,000 to 250,000. This amendment became Article 3. The bill passed both houses of the legislature on April 7, 1936, when 250,000 Belgian francs were the approximate equivalent of $8,450 on the free international monetary market. In 1949, the Belgian franc was further devalued to its present official rate of 50 Belgian francs—$1.00 (Fed.Reserve Bull., Vol. 36, 1950). At this rate, 250,000 Belgian francs— $5,000. The plaintiffs contend that this Law of April 7, 1936, was the instrument of ratification; that it is invalid because the subsequent devaluation of that Belgian franc would, by the terms of that Law, limit the plaintiffs to a recovery of $5,000 each instead of the Convention figure of approximately $8,300, in the absence of proof that wilful misconduct was a proximate cause of the crash. As to the question of the conversion in round figures of 125,000 French francs into Belgian francs (as permitted by Article 22(4) of the Convention), it would appear that a conversion (stated in American dollars) of $8,-300 into $5,000 can hardly be regarded as an approximate equivalent in round figures.

The efficacy of the Law of April 7, 1936 *as* a ratification must be determined by this court only *if* that Law was, in fact, the attempted ratification of the Convention. To some extent, the difficulties engendered by the Law of April 7, 1936, may be attributed to the fact that it is not only in the nature of a ratification but is also a domestic enactment providing for a Convention limitation upon domestic flights, and may even be an "enabling statute." That the Law of April 7, 1936, was not the Belgian "ratification," however, is borne out by both the text of the Convention itself and the subsequent actions of the Belgian Government with regard to the Convention. In determining what constitutes a ratification of the Convention, this court must look to the agreement itself. Like many such agreements, the Convention provides its own dictionary. Philippson v. Imperial Airways, Ltd., [1939] A.C. 332. Article 37 thereof provides that "[t]his convention shall be ratified" and that: "[t]he instruments of ratification *shall be deposited* in the archives of the Ministry for Foreign Affairs of Poland." (Emphasis added.) It further provides that the Ministry for Foreign Affairs of Poland *"shall give notice of the deposit* to the Government of each of the High Contracting Parties." (Emphasis added.) After five of the High Contracting Parties have ratified the Convention, "it shall come into force between the High Contracting Parties which shall have ratified [including, in the chronological sequence of this case, the United States] and the High Contracting Party which deposits its instrument of ratification [in this case, Belgium] *on the ninetieth day after the deposit."* (Emphasis added.)

The Law of April 7, 1936, including the restrictive limitation contained in Article 3 thereof, was never deposited with the Government of Poland. If the Law of April 7, 1936, was what the

---

4. In 1934, a Belgian franc was the equivalent of 4.657 American cents. 180,000 such francs were the equivalent of $8,-382.60. The equivalent of the Convention French gold francs in American dollars has always approximated $8,300.

plaintiffs allege it to be, i. e., the means by which Belgium attempted to ratify the Convention, it would have been wholly ineffectual (even apart from its lesser monetary limitation) since it was never filed.

But the Law of April 7, 1936, was not the sum of Belgian action with regard to the Convention; nor does it appear to be the vehicle by which that Government ratified the Convention. Rather, on July 13, 1936, Belgium deposited with the Ministry in Poland the instrument set out at page 12, supra. This instrument, as certified by the Polish Government, in its Procés-Verbal, sets out the text of the Convention in full, including the proper Convention limitation found in Article 22, and states that:

"We, finding agreeable the acts which precede, approve, *ratify* and confirm *them,* promising to have *them* observed, according to *their* form and tenor, without permitting that they be contravened in any manner whatsoever.

"In witness whereof we have signed *these present letters of ratification* and have affixed thereto Our royal seal." (Emphasis added.)

No mention whatever is made of the Law of April 7, 1936, in this instrument. Unlike the Law of April 7, 1936, it was deposited with the Polish Government; said deposit was certified by the Polish Government in the said Procés-Verbal, quoted supra; the Government of Poland then notified the United States of Belgium's ratification by letter, quoted supra; and our Secretary of State acknowledged receipt thereof by his letter, quoted supra. The clear import of the instrument deposited on July 13, 1936, its strict conformity with the Convention's ratification procedures, and the

action taken by the Polish Government with respect to it, indicate that that instrument, rather than the Law of April 7, 1936, was the means by which Belgium ratified the Convention.

■■ Since there is not available to the court (or, for that matter, to anyone) a copy of the actual text of the Convention which accompanied the instrument filed in Poland on July 13, 1936, it cannot be established, beyond a shadow of a doubt, that within this text Belgium did not convert the Convention French francs into Belgian francs. Article 22(4) permits a nation to convert the Convention French francs "into any national currency in round figures" and it is arguable that had Belgium done so, this conversion may not have been noticed or questioned by the Polish Government prior to the issuance of its Procés-Verbal. Such an argument, however, would be purely conjectural—indeed, all the evidence in this case would indicate the contrary. The defendant Sabena has come forward with substantial proof that the Convention was properly ratified and that the actual ratification did not deviate from the standard set forth in Article 22. The Governments of three nations— the United States, Poland and Belgium— have substantiated this contention. Moreover, a reading of the entire Convention diminishes the possibility that, *in the actual ratification,* Belgium made any conversion into Belgian francs. Article 22(4), which permits a conversion, does not state when, or in what manner, this conversion may be made.[5] By contrast, the Additional Protocol, which permits a contracting party to exempt from the provisions of Article 2(1) air travel performed directly by the state, expressly provides that such a reservation must be made *"at the time of ratification or*

5. See Drion, Limitation of Liabilities in International Air Law (Martinus Nijhoff 1954). The author notes, at page 184, that there may be four relevant times of conversion. "The following moments can be defended as relevant:

(1) the moment that the national legislator ratifies or adheres to the Convention or any later moment chosen by the legislator,
(2) the moment that the claim arises,
(3) the moment that judgement or an arbitral award is given,
(4) the date of payment."

*of adherence."* (Emphasis added.) Since no such condition is placed upon the conversion provided for in Article 22(4), it would appear that the conversion may be made at a time other than that of ratification, and it would be unreasonable to assume that, notwithstanding, Belgium thought it necessary to make the conversion in its instrument of ratification.

Of course, this does not mean that a subsequent application of an improper conversion might not constitute a breach of the Convention. But such a state of facts would have no bearing on the outcome of this case. See pp. 142–144 infra. In light of all the evidence presented herein, the court is of the opinion that Sabena has made a prima facie showing of Belgium's ratification of the Convention and its adherence therein to the proper monetary standard. Plaintiffs have advanced nothing, other than conjecture, to support their contention and overcome this prima facie showing. (The court regards as conjecture the argument of plaintiffs that the Belgian instrument of ratification included a copy of the Law of April 7, 1936, merely because both instruments were published in Bulletin Usuel DesLois in September 1936). It is the finding of this court, therefore, that Belgium effectively ratified the Convention by depositing an instrument of ratification on July 13, 1936 and that the Convention took effect as between the United States and Belgium ninety days thereafter.

### The Inconsistent Law of April 7, 1936

What effect does the inconsistent Law of April 7, 1936 have upon the applicability of the Convention to the instant case? Once again this question is beclouded by plaintiffs' erroneous assertions to the effect that Belgium "had purported to adopt the Warsaw Convention by virtue of a ratification of April 7, 1936." In substance, their arguments may be interpreted as follows: the Law of April 7, 1936 was a ratification with a reservation; such reservation was in-

valid and never acceded to by the United States; therefore, the attempted ratification was null and void. But this contention ignores the obvious—if the "reservation" contained in the "purported ratification" by the Law of April 7, 1936 rendered said ratification null and void, we are still left with the otherwise valid ratification by virtue of the instrument deposited in Poland on July 13, 1936.

Plaintiffs' arguments may be interpreted in another, albeit equally untenable way; i. e., that Article 3 of the Law of April 7, 1936 was a reservation to the ratification deposited on July 13, 1936, thereby invalidating that ratification. But such a contention is contrary to the very words of the July 13 ratification. That ratification makes no mention of the Law of April 7, 1936. As the court has concluded on the basis of all the evidence before it, this instrument sets out Article 22 of the Convention and affirms that it, like all of the other provisions of the Convention, will be "observed, according to *their* form and tenor." (Emphasis added.) This affirmation can refer only to the provision certified as being set out in the instrument itself. To interpret it as referring to an unmentioned provision of an earlier piece of legislation is impermissible.

The situation is not wholly without analogy to that considered by our Supreme Court in New York Indians v. United States, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898). There the Senate, in rendering its necessary advice and consent to a treaty, made certain amendments including the addition of a certain proviso. The President, however, signed a copy of the treaty, which made no reference to the Senate proviso. The Court found that the treaty had been properly ratified and that the disputed proviso was not a part thereof:

"But did this resolution ever become operative? It is not found in the original, nor in the published copy of the treaty, nor in the proclamation of the president, which recites that the senate did, by a reso-

lution of the 11th of June, 1838, 'advise and consent to the ratification of said treaty with certain amendments, which treaty, as so amended, is word for word as follows, to wit: ' \* \* \* But no allusion is here made to the final resolution or its proviso. This is the more remarkable, as every other amendment made by the senate appears in the treaty as published, while no reference whatever is made to this; the reason probably being that the resolution was mainly directory in its character \* \* \*. The proviso may also have been well considered as merely directory to the president, but in any event it is difficult to see how it can be regarded as part of the treaty, or as limiting at all the terms of the grant.

" \* \* \* There is something, too, which shocks the conscience, in the idea that a treaty can be put forth as embodying the terms of an arrangement with a foreign power or an Indian tribe, a material provision of which is unknown to one of the contracting parties, and is kept in the background, to be used by the other only when the exigencies of a particular case may demand it. \* \* [A]s the proclamation purported to set forth the treaty 'word for word' as so amended, of course the amendments referred to were those embodied in the treaty as published in the proclamation." 170 U.S. at 22–23, 18 S.Ct. at 536.

There are, of course, several distinctions between New York Indians v. United States, supra, and the instant case; the most notable being that New York Indians dealt with the ratification procedure to be followed by our Government whereas the instant case deals tangentially with that to be followed by the Belgian Government. The striking similarity, however, is that there, as here, the proclamation set out the treaty "word for word" and it was that treaty, *as so set out*, which the Court sustained—that which was not so set out was disregarded.

Thus, the Law of April 7, 1936 was neither a "ratification" nor a "ratification with a reservation." It may have one of the following effects upon Belgium's adherence to the Convention: (1) As a prior, inconsistent legislative enactment it may have divested the King of authority to sign the instrument of ratification deposited on July 13, 1936; or (2) the enactment of the Law of April 7, and its subsequent application by the Belgian courts, may constitute a breach of the Convention. In neither event, however, can its effect be to render the Convention inapplicable to the instant case.

The first alternative is not specifically argued by the plaintiffs. Moreover, it may not, as a matter of Belgian law, be accurate. (Sabena contends that "Under Article 68 of the Belgian Constitution, parliamentary assent is not required to ratify or create binding international obligations out of a treaty. \* \* \* In Belgian law, ratification of a treaty is a written act, signed by the King and counter-signed by the Minister of Foreign Affairs.") But whether or not this Law divested the King of authority to ratify the Convention is of no import to the instant decision. It is the finding of this court that such a question lies beyond judicial cognizance. Doe ex dem. Clark v. Braden, supra, clearly stands for the proposition that the judicial branch is without power to determine whether a foreign head of state who entered into a treaty with the United States was empowered by the laws of his nation to do so. Although there are some distinctions between that case and the situation now before the court (most notably the fact that the governmental action by our political branches in the instant case is of a far lesser degree), these distinctions are not of such scope as to render inapplicable the principle enunciated by our highest Court.

The second alternative, i. e., that the passage and application of the Law of

April 7, 1936 [6] constitutes a breach of the Convention, is the more plausible of the two. Since it may be argued that Belgium has permitted the Convention to be contravened in that it has applied the devaluated Belgian franc standard of Article 3 of the Law of April 7, 1936 rather than the gold standard of Article 22 of the Convention. This, however, cannot affect the instant decision.

It is of interest, but of no relevance, that, in 1963, Belgium altered its domestic law and eliminated the discrepancy between that law and the Convention standard, when it became an adherent to the Hague Protocol of 1955. That Protocol doubled the limitation of monetary recovery provided in the Convention. Its Law of July 30, 1963, expressly repealed Article 3 of the Law of April 7, 1936, and provided that:

"The conversion into Belgian money of the amounts indicated in francs in said Convention as well as in said Protocol, which relate to a monetary unit consisting of 65.½ milligrams of gold of millesimal fineness 900, will be effected, in case of a procedure before a court, in accordance with the gold value of the Belgium currency on the date of the court's decision." [7]

The question as to whether or not Belgium breached its obligations under the Convention prior to the enactment of the Law of July 30, 1963, is not properly before this court. It is not within the power of this court to declare that Belgium has breached the Convention, thereby releasing the courts of the United States from the observance thereof. In Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913), the Court rejected a contention that, since Italy had allegedly breached an extradiction treaty with the United States, our courts were

6. The plaintiffs have submitted two Belgian decisions which indicate that the courts of that nation have, notwithstanding the devaluation of the Belgian franc, applied the restrictive limitations of the Law of April 7, 1936 rather than the more favorable limitations of Article 22 of the Convention, in cases properly subject to the Convention. See Tribunal Civil de Bruxelles, 12 Mai 1950, Pasicrisie 1950, III, 96 and Tribunal Civil de Bruxelles, 30 Juin 1950, Journal des tribuneaux 1951, No. 4723. In the latter case the court stated that:

"b) the effect of the adoption by the Legislative Chambers of [Article 3] * * * was to remove any reference to the gold content of the franc and categorically fix the carrier's liability at 500 francs per kilogram of registered baggage and goods.

"Whereas it appears from these considerations that, in accordance with the terms of Article 3 of the Belgian law of 7 April 1936, modifying Article 22 of the Warsaw Convention, Sabena's liability is limited to the sum of 500 francs per kilogram."

While this latter case deals with the limitation of recovery for damage to baggage, it and the opinion of May 12, 1950 clearly indicate that the Belgian courts which have considered this question regard the Law of April 7, 1936, and its restrictions, as binding in actions arising under the Convention.

7. The Explanatory Note to the Law of July 30, 1963, Documents Parlementaires, Chambre 1961-62, No. 290-1, pp. 2-3, states:

"Article 3 [of the Law of July 30, 1963] replaces Article 3 of the Law of April 7, 1936 which has proved in practice to be a rather awkward provision ['s' est revele, dans la pratique, etre une disposition assez malencontreuse']. This article, indeed, fixed without variation ['ne varietur'] the equivalent of the B. Frs. 125,000 provided in the Convention exclusively on the basis of the value of the Belgian franc at the time the Convention was ratified. It hardly needs any explanation that the subsequent devaluation of the Belgian franc in relation to gold has since that date changed in a considerable manner the monetary relation fixed by the legislature.

In order to comply with Article XI, para. 5 [which is the same requirement contained in Article 22(4) of the Convention] of the Protocol, Article 3 of this new law aims at escaping this anomaly, without awaiting the coming into force of the new Protocol itself by providing that in case of litigation the conversion of the amounts indicated in gold francs will be made according to the gold value of the national currency at the date of the judgment."

free to disregard our obligations thereunder. The Court noted that:

"If the attitude of Italy was, as contended, a violation of the obligation of the treaty, which, in international law, would have justified the United States in denouncing the treaty as no longer obligatory, it did not automatically have that effect. If the United States elected not to declare its abrogation, or come to a rupture, the treaty would remain in force. It was only voidable, not void; and if the United States should prefer, it might waive any breach which, in its judgment, had occurred, and conform to its own obligation as if there had been no such breach." 229 U.S. at 473, 33 S.Ct. at 954. Citing 1 Kent, Com. p. 175; Vattel, Nations, 452; Grotius, bk. 3, chap. 20, ¶ 38; 5 Moore's International Law Digest, p. 366.[8]

See George E. Warren Corp. v. United States, 94 F.2d 597 (2d Cir.), cert. denied, 304 U.S. 572, 58 S.Ct. 1041, 82 L.Ed. 1537 (1938). There the petitioner contended that the Secretary of the Treasury had violated a treaty with Great Britain and Germany by assessing certain taxes. The court noted that:

"The fundamental difficulty with the petitioner's suit is that it seeks to submit to judicial decision questions which are not justiciable but pertain to the executive branch of the government. *It is not for a court to say whether a treaty has been broken or what remedy shall be given*; this is a matter of international concern, which the two sovereign states must determine by diplomatic exchanges, or by such other means as enables one state to force upon another the obligations of a treaty. * * * These are matters concerning the relations between the two nations and their adjustment must be left to the field of diplomacy. *Obviously, it would not do for the courts to declare that an act is a breach of a treaty and results in this or that remedy.* The remedy accorded might not content the foreign power or might bring about a conflict between the executive and judicial branches of our own government." 94 F.2d at 599. (Emphasis added.)

*"International Transportation"*

The Convention must be applied if the transportation involved herein was "international" within the meaning of Article 1(2). See page 132 supra. The plaintiffs contend that Belgium was "a place of destination" under the contracts of carriage and that, since Belgium was not a High Contracting Party, the flight was not "international." Since the court holds that, as of the date of the crash, Belgium was a High Contracting Party, if Belgium was, in fact, a "place of destination," the transportation was "international" under that part of Article 1(2) which covers "transportation in which, according to the contract made by the parties, the place of departure [United States] and the place of destination [Belgium] * * * are situated * * within the territories of two High Contracting Parties." Although the court disagrees with the contention that Belgium was a "place of destination" it reaches the same conclusion, i. e., that the transportation involved herein was "international."

As noted previously, each of the passengers involved in this action was travelling on a round trip ticket from a point within the United States to cities in Europe and return to the United States. Each ticket, which constitutes "the contract made by the parties," 1

8. Moore states that:
 "A treaty is primarily a compact between independent nations, and depends for the enforcement of its provisions on the honor and the interests of the governments which are parties to it. If these fail, its infraction becomes the subject of international reclamation and negotiation, which may lead to war to enforce them. With this judicial tribunals have nothing to do."

Kriendler, Aviation Accident Law, § 11.05[1] at 361–362 (1963), thus provided for "International" transportation under that part of Article 1(2) which states that:

> "the expression 'international transportation' shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, * * * are situated * * * within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention."

See Block v. Compagnie Nationale Air France, 229 F.Supp. 801, 805 (N.D.Ga. 1964); Glenn v. Compania Cubana De Aviacion, S.A., 102 F.Supp. 631 (S.D. Fla. 1952); Ross v. Pan American Airways, Inc., 299 N.Y. 88, 85 N.E.2d 880, 13 A.L.R.2d 319 (1949); Garcia v. Pan American Airways, Inc., 269 App.Div. 287, 55 N.Y.S.2d 317 (2d Dep't 1945), aff'd per curiam, 295 N.Y. 852, 67 N.E. 2d 257 (1946); Grein v. Imperial Airways, Ltd., [1937] 1 K.B. 50.

### *What is the Applicable Limitation on Recoverable Damages?*

 Plaintiffs further argue that, in the event that the Convention be found applicable, the limitation of liability to be applied is not that contained in Article 22 of the Convention ($8,300), but, rather, the $16,600 specified by the Belgian Law of July 30, 1963 and Article XI of the Hague Protocol to the Convention. The court finds this contention to be without merit. The United States is not an adherent to the Hague Protocol— it is bound only by the Convention. Although the internal law of Belgium may now provide a higher limitation, it is not applicable. This is not a case, such as that suggested by the Court of Appeals for this Circuit in its recent decision in Mertens v. Flying Tiger Line, Inc., 2d Cir., 341 F.2d 851, February 16, 1965,

where the Convention's limitations are, for one reason or another, inapplicable.

Although plaintiffs have made some reference to New York's strong public policy against monetary limitation in wrongful death actions, see Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961); Pearson v. Northeast Airlines, Inc., 309 F.2d 553, 92 A.L.R.2d 1162 (2d Cir. 1962), cert. denied, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963), it is clear that this state policy is irrelevant. Even if the Kilberg doctrine were not otherwise inapplicable, see Gore v. Northeast Airlines, Inc., 222 F.Supp. 50 (S.D. N.Y.1963), it is well settled that it would be inapplicable in light of the fact that the Convention, and the limitations contained therein, is the Law of the Land and must be applied, notwithstanding contrary state law or public policy. U.S. Const. art. 6, cl. 2. See, e. g., Block v. Compagnie Nationale Air France, supra; Garcia v. Pan American Airways, Inc., supra. See also, United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942). This is not to say that there will be no choice of law problems presented in this case; there may be such problems because the Convention itself leaves certain questions (such as who are the proper beneficiaries of a damages award) to the internal law of the parties to the Convention. See Mertens v. Flying Tiger Line, Inc., supra. But just as New York public policy with regard to monetary limitations on recovery is immaterial in light of the applicability of the Convention and its limitations, so is the internal law of Belgium. That internal law cannot influence our decision on any theory of conflict of laws since it is that conflict which the Convention specifically sought to eliminate on this point. Although Belgian law may prove to be relevant to this case on several questions, including the alleged negligence of Sabena (in conjunction with the provisions of the Convention), see Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963); Dym v. Gordon, 22 A.D.2d 702, 253 N.Y.S.2d

802 (2d Dep't 1964); Blum v. American Youth Hostels, Inc., 40 Misc.2d 1056, 244 N.Y.S.2d 351 (1963), aff'd, 21 A.D.2d 683, 250 N.Y.S.2d 522 (2d Dep't 1964), it can have no bearing on the question of monetary limitations. As noted by the court in Garcia v. Pan American Airways, Inc., supra:

"It comes to this: One is not bound to seek redress in the courts of this country. He may submit to the jurisdiction of the foreign state and, presumably, have his rights determined in accordance with the law of that place. That is not our concern. But if he institutes action here, the law which we will apply is that set forth by the terms of the Convention, even though it be inconsistent with the law of the place." 55 N.Y. S.2d at 321.[9]

■ Similarly, the ratification by Belgium of the Hague Protocol does not have the effect of extending the $16,600 limitation thereof to this case because the United States has not ratified that Protocol. Article XVIII of the Protocol specifically provides:

"The Convention as amended by this Protocol shall apply to international carriage as defined in Article 1 of the Convention, provided that the places of departure and destination referred to in that Article are situated either in the territories of *two parties to this Protocol* or within the territory of *a single party to this Protocol* with an agreed stopping place within the territory of another State." (Emphasis added.)

Thus, whether the instant contracts of carriage be considered as running from the United States to Belgium, or from the United States to the United States with stopping places in Belgium (see pages 144, 145, supra), it is the Convention's limitations which must be applied herein. See Mankiewicz, Hague

Protocol to Amend the Warsaw Convention, 5 Am.J.Comp.L. 78, 93 (1956) ("It follows therefrom [Article XVIII] that the original Convention continues to be applicable to carriage between the territories of parties to the Convention as long as only one of them has become a party to the Hague Protocol.")

*The Additional Protocol of 1929*

One further point should be noted. There is some indication that Sabena may be owned in large measure by the Belgium Government itself. This possible ownership has raised some question with regard to the Additional Protocol to the Convention which has been ratified by both Belgium and the United States. It provides:

"The High Contracting Parties reserve to themselves the right to declare *at the time of ratification or of adherence* that the first paragraph of article 2 of this convention shall not apply to international transportation by air performed *directly* by the state, its colonies, protectorates, or mandated territories, or by any other territory under its sovereignty, suzerainty, or authority." (Emphasis added.)

The first paragraph of Article 2 of the Convention provides:

"(1) This convention shall apply to transportation performed by the state or by legal entities constituted under public law provided it falls within the conditions laid down in article 1 [i. e., international transportation]."

The Additional Protocol merely gives to a High Contracting Party the *right* to make such an exemption at the time of ratification or adherence; ratification without an exercise of that right has no effect. The United States, in the Presidential Proclamation of adherence to the Convention, not only adhered to the Ad-

---

9. It is for this same reason that the court rejects Sabena's contention that, even though the Convention is applicable, the limitation contained in Article 3 of the Law of April 7, 1936 ($5,000) must be applied to the instant case.

ditional Protocol but also specifically exercised the right granted therein:

"AND WHEREAS the said convention and the said additional protocol have been definitively adhered to by the United States of America, *subject to the reservation, as is provided for in the additional protocol,* that the first paragraph of Article 2 of the convention shall not apply to international transportation that may be performed by the United States of America or any territory or possession under its jurisdiction * * *." (Emphasis added.) [10]

 Belgium, on the other hand, did not exercise the right to such exemption when it ratified the Convention and the Additional Protocol in 1936. Thus it is clear that, with regard to international air travel performed even directly by that State, the provisions of Article 2(1) continue to apply. Certainly the plaintiffs do not argue that by exempting air travel to be performed by the United States, this nation exempted international air travel performed by any other High Contracting Party. Indeed, this would be contrary to the very right granted in the Additional Protocol; i. e., the right of each High Contracting Party to exempt air travel "performed directly by *the* state * * * or by any other territory under *its* sovereignty, suzerainty, or authority." (Emphasis added.)

10. It should be noted that the United States has apparently chosen to grant an even broader exemption than that envisioned by the Additional Protocol. Whereas the Protocol gives the right to exempt international air travel "performed *directly* by the state," the Proclamation exempts any international air transportation that "may be *performed by*" the United States or any of its territories or possessions. See Mertens v. Flying Tiger Line, Inc., supra.

11. Although thirteen States of the United States place limitations upon wrongful death damages, none of these are below $20,000. See, Sincoff, A Survey of Aviation Accident Law, Vol. XII, The Nassau Lawyer 22, 26–27 (1964). A sizeable group of foreign nations, however, have enacted domestic limitations far below the Convention standard. See Mennell &

Since Belgium did not exercise the right granted to it by the Additional Protocol, this court need not pass upon the question as to whether such an exemption, if exercised, would have had application to the international transportation involved herein. However, the legislative history surrounding the formulation of the Additional Protocol, as well as a reading of that Protocol in conjunction with Article 2(1), indicates that such an exemption would not apply to "legal entities constituted under public law" acting in a purely commercial character, notwithstanding partial or even complete state ownership therein. See Cheng, XI Current Legal Prob. 225, 254 (1958) ("the additional protocol merely makes it possible to exclude carriage by air performed directly by the State, but not carriage performed indirectly through juristic persons of public law"); Shawcross & Beaumont, Air Law § 324 n. (a) at p. 300 (2d ed. 1951) ("It is submitted that carriage performed by the United Kingdom 'airways corporations' * * * is probably not 'performed by the State,' and most certainly not 'directly' so performed, but that the Corporations are 'legally constituted public bodies.' ").

 The plaintiffs urge the inequity of the $8,300 limitation; indeed, this sum is small recompense for the loss of human life.[11] But so long as our po-

Simeone, United States Policy and the Warsaw Convention, 2 Washburn L.Rev. 219, 223 n. 15 (1963) where the authors note that:

"A tabulation prepared by the ICAO Secretariat in 1953, Doc. 7450–LC 136, II, Annex VI, App. VII, Ninth Session of the Legal Committee, Rio de Janiero shows the following limitations by countries: Belgium, 250,000 Frs. ($5,-000); Brazil, 100,000 Cruzeiros ($5,-405.41); Denmark, 18,250 Kr. ($2,-645); Germany, 20,000 Marks ($7,-460); Italy, 160,000 Lira ($256); Luxembourg, 375,000 Fr. ($7,500); Mexico, 75,000 Pesos ($8,670.52); Netherlands, 12,500 Fl. ($3,289); New Zealand, 5000 Pounds ($13,964); Poland, 10,000 Zloty (?); Sweden, 18,250 Kr. ($3,509); Costa Rica, 20,000 Colons ($3,561.88); Guatemala, 5,000 Quetzels ($5,000)."

litical branches choose to remain bound to this Convention, the judiciary has no choice but to enforce its restrictive provisions.

It is, therefore, the finding of this court that the Warsaw Convention is applicable to the facts of this case, and that, unless proven inapplicable by any other provisions thereof, the limitations of Article 22 of the Convention for personal injury or death shall apply.

While the court reaches this decision with certainty, it is not unmindful of the admonition of Mr. Justice Cardozo, then sitting on the New York Court of Appeals, in Techt v. Hughes, 229 N.Y. 222, 247, 128 N.E. 185, 193, 11 A.L. R. 166, cert. denied, 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454 (1920):

"No one can study the vague and wavering statements of treaties and decision in this field of international law [the application of a treaty] with any feeling of assurance at the end that he has chosen the right path. One looks in vain either for uniformity of doctrine or for scientific accuracy of exposition. There are wise cautions for the statesmen. There are few precepts for the judge."

The court, therefore, deems it advisable to certify this decision to the Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 1292(b). The controlling question of law herein (i. e., the applicability of the Convention and its limitation of approximately $8,300) is one as to which "substantial ground for difference of opinion" exists. "[A]n immediate appeal from the order may materially advance the ultimate termination of the litigation."

Settle an order consistent herewith on or before ten (10) days from the date hereof.